COUNCIL OF ALTERNATIVE POLITICAL PARTIES; Green Party of New Jersey; Natural Law Party; NJ Conservative Party; NJ Libertarian Party; U.S. Taxpayers Party of New Jersey; Albert LaRotonda; Gary Novosielski; Madelyn Hoffman; Jim Mohn; Mary Jo Christian; Jeffrey M. Levine; Tom Blomquist; Bernard Sobolewski; Sal Duscio; Anne Stommel; Leonard Flynn; John Paff; Michael Buoncristiano; Emerson Ellett; Charles Novins; Lowell T. Patterson; Eugene R. Christian; Scott Jones; Richard S. Hester, Sr.; Barbara Hester; Austin S. Lett; Arnold Kokans; Leona Lavone; Shirley Boncheff; Christian Zegler; Victoria Spruiell; Harley Tyler, Appellants,

v.

Lonna R. HOOKS, Secretary of State of the State of New Jersey, in her Official Capacity, and her Successors.

No. 97–5398.

United States Court of Appeals, Third Circuit.

Argued July 21, 1997.

Decided Aug. 4, 1997.

---

Lenora M. Lapidus (Argued), David R. Rocah, American Civil Liberties Union of New Jersey, Newark, NJ, for Appellants.

Peter Verniero, Attorney General of New Jersey, Joseph L. Yannotti, Assistant Attorney General, Donna Kelly (Argued), Senior Deputy Attorney General, Trenton, NJ, for Appellee.

Before: STAPLETON, SCIRICA and McKEE, Circuit Judges.

## OPINION OF THE COURT

STAPLETON, Circuit Judge:

This appeal requires us to review the district court's denial of preliminary injunctive relief. The district court concluded that the plaintiffs were likely to succeed on the merits of their claims and found that they would be irreparably harmed in the absence of preliminary relief. However, the court also found that the defendant would be harmed even more severely were preliminary relief to be granted and that the public interest disfavored such relief. Although our standard of review is quite deferential, we will reverse the district court. We conclude that the district court clearly erred in finding that preliminary injunctive relief would inject confusion and disarray into New Jersey's 1997 electoral process and that the court abused its discretion in denying plaintiffs preliminary relief.

### I.

There are multiple plaintiffs in this case. The Council of Alternative Political Parties is an unincorporated association representing five New Jersey "alternative political parties:" the Green Party, the Natural Law Party, the Conservative Party, the Libertarian Party, and the U.S. Taxpayers Party.[1] Each of these five alternative political parties is also a plaintiff. In addition, there are twenty-seven individual plaintiffs, all of whom are either candidates desiring to run for state office as nominees of these alternative parties or are supporters of these parties. Some of the plaintiff candidates have qualified for a place on the November 4, 1997 general election ballot while others have tried to do so but failed.

Plaintiffs initiated this action on April 8, 1997. In it they challenge the constitutionality of N.J. Stat. Ann. § 19:13–9, which requires all candidates seeking placement on New Jersey's general election ballot to file nominating petitions no later than 54 days prior to the primary election. Valid nominating petitions must be signed by a number of registered voters specified by law. The number of signatures required depends on the office being sought. For example, alter-

---

1. New Jersey restricts the formal appellation "political party" to those organizations that received at least 10% of the total statewide vote at the previous election of the General Assembly. *See* N.J. Stat. Ann. § 19:1–1. We will refer to the plaintiff political organizations as "alternative political parties," as plaintiffs refer to themselves, to indicate that they are not formally recognized "parties" within the meaning of New Jersey law.

native party candidates for governor must file petitions signed by at least 800 registered voters. *See* N.J. Stat. Ann. § 19:13–5. Only 100 signatures are required for alternative party candidates for State Senate; candidates for the General Assembly who file joint petitions need collect just 50 signatures. *See id.* Alternative political parties may only nominate candidates through the petition procedure. *See* N.J. Stat. Ann. § 19:13–1.

In accordance with state law, the primary election this year was held on June 3, 1997. *See* N.J. Stat. Ann. § 19:2–1. Nominating petitions and signatures had to be filed with defendant, the Secretary of State, no later than 54 days prior to this date, which was April 10, 1997. Plaintiffs contend that the April filing date imposes an unconstitutional burden on their right of free association, right to vote, and right to equal protection of the laws.

The plaintiffs moved for a preliminary injunction to enjoin the Secretary from refusing to accept their nominating petitions if submitted on or before July 28, 1997. In effect, they sought an extension—for candidates of alternative political parties—of the deadline for collecting signatures and filing nominating petitions. The date July 28, 1997 was not chosen at random. It is the 99th day preceding the general election and is, therefore, the date that nominating petitions for alternative party candidates for president would be due if this were a presidential election year. *See* N.J. Stat. Ann. § 19:13–9.

On June 16 the district court held a hearing on the plaintiffs' motion and then denied them relief. The court found that the plaintiffs were likely to prevail on the merits of their claim that New Jersey's April filing deadline imposes an unconstitutional burden on the rights of alternative political parties, their candidates, and voters who might support them. It also found that, without a preliminary injunction, plaintiffs would suffer irreparable harm, because they would be unable to fully exercise their voting and associational rights. However, the court also declared that granting preliminary relief at this

late date would inject disorder and disarray into the electoral process and unduly interfere with the November 1997 general election. Hence, the court concluded that the Secretary would be more harmed from entry of a preliminary injunction than the plaintiffs would be from denial of relief. It also believed the public interest in a fair and orderly 1997 election disfavored granting plaintiffs relief.

Plaintiffs filed a timely notice of appeal and sought expedited review and an injunction pending appeal. We expedited the appeal and heard oral argument on July 21. That same day we entered an order reversing the district court and directing it to enter a preliminary injunction enjoining the Secretary from refusing to accept nominating petitions submitted by named candidate plaintiffs and candidates of the plaintiff alternative political parties on or before July 28, 1997. This opinion expresses our reasons for that action.[2]

**II.**

Our cases recognize four factors to be considered in assessing a motion for a preliminary injunction. They are: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest. *See American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471, 1477 n. 2 (3d Cir.1996) (in banc). Here, all four factors favor granting relief.

We agree with the district court that the plaintiffs established a likelihood of success on the merits. In *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), the Supreme Court invalidated Ohio's requirement that candidates for president desiring a place on that state's general election ballot had to file nominating

**2.** The plaintiffs' claims arise under 42 U.S.C. § 1983. The district court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). We have jurisdiction under 28 U.S.C. § 1292(a)(1) to review the district court's interlocutory order refusing an injunction.

petitions and statements of candidacy by March 20 of the election year. The challenge was brought by John Anderson, who declared his 1980 independent candidacy for president on April 24 of that year, by which time it was too late for him to qualify for Ohio's November ballot. Anderson claimed that Ohio's early filing deadline unconstitutionally burdened the voting and associational rights of himself and his supporters.

In assessing these claims, the Court explained that each provision of a state's election code inevitably affects the right of association and the right to vote. *Id.* at 788, 103 S.Ct. at 1569–70. However, " 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.' " *Id.* (quoting *Storer v. Brown,* 415 U.S. 724, 730, 94 S.Ct. 1274, 1279, 39 L.Ed.2d 714 (1974)). Thus, in assessing the merits of a constitutional challenge to a specific provision of a state's election laws, a court must carefully weigh competing factors.

> It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Id.* at 789, 103 S.Ct. at 1570.

When we consider the character and magnitude of the injuries to plaintiffs' rights resulting from New Jersey's April 10 filing deadline, we discover that the plaintiffs suffer from two of the same injuries asserted in *Anderson.* First, as the Court explained, issues and candidates do not remain static

over the course of an election campaign. *Id.* at 790, 103 S.Ct. at 1571. By depriving alternative political parties of the opportunity to recruit and nominate candidates after early April, New Jersey's filing deadline substantially restricts the abilities of these parties and their supporters to react to events occurring after April 10. In particular, New Jersey's Democrats and Republicans can base their nomination decisions on everything that precedes the June 4 primary, but the candidate-selection calculations of alternative political parties must cease 54 days earlier. Moreover, as was true in *Anderson,* voters are burdened by the deadline's preclusion of the possibility of independent or alternative party candidates emerging in response to disaffection with the nominees of the major parties. *See id.* at 791–92, 103 S.Ct. at 1571–72.[3]

Second, early spring filing deadlines require candidates to gather signatures at a time when the election is remote and voters are generally uninterested in the campaign. *See id.* at 792, 103 S.Ct. at 1572. New Jersey's filing deadline is the third earliest in the country. *See* App. 87. When April 10, 1997 arrived, the general election was almost seven months away, and even the nomination of the Democratic and Republican candidates still lay nearly two months ahead. Additionally, because New Jersey holds its state elections in "odd" years, and federal elections are held in "even" years, the period in which signatures must be gathered always follows immediately after a general election. This further exacerbates the difficulties involved in recruiting volunteers and persuading voters to contemplate signing nominating petitions.

An additional burden, not involved in *Anderson,* also deserves note. In New Jersey a political organization only obtains "party" status if it polls at least 10% of all votes cast in a General Assembly election. *See* N.J. Stat. Ann. § 19:1–1. Only "parties" are entitled to hold primary elections, *see id.,* and

---

**3.** Because the inability to respond to post-deadline events imposes a substantial burden on both candidates and voters, *Anderson* suggests that a state must be able to point to a particularly strong countervailing interest in order to justify a filing deadline that requires alternative candidates to file nominating petitions before the major political parties have chosen their candidates for the general election.

only they are bestowed with a label implying a state-recognized level of seriousness and continuity. Unless a group is able to place its candidates on the ballot in every Assembly district, it is most unlikely that the group will ever have an opportunity to become an official "party" and obtain the benefits accompanying this status. By making it difficult to place candidates on the ballot, New Jersey's April filing deadline thereby burdens alternative political parties aspiring to "party" status. *See* App. 88a (showing that no group other than Democrats and Republicans has qualified as "party" in New Jersey since at least 1913).

■ Having considered these burdens on plaintiffs' rights, we must next identify and evaluate the state's proffered justifications for its April filing deadline. When asked at oral argument to detail the state's interest in requiring all candidates to file on the same date, counsel for the Secretary referred us to the New Jersey Supreme Court opinion in *Sadloch v. Allan*, 25 N.J. 118, 135 A.2d 173 (1957), which explains that the uniform filing deadline is intended to prevent major party candidates from reacting to actual or anticipated defeat in a primary by launching an independent or alternative party campaign against the major party nominee. While it is true that so-called "sore loser" and disaffiliation laws have been upheld, *see, e.g., Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974), early filing deadlines cannot be defended on these grounds when, as here, they are both too broad—by preventing the candidacies of individuals who did not or could not participate in a primary—and too narrow—by allowing the candidacies of former major party candidates if they decide to break with their parties before April 10. *See Anderson*, 460 U.S. at 805 & n. 31, 103 S.Ct. at 1578 & n. 31.

In its brief, the Secretary also suggests that the uniformly early filing deadline can be justified by the state's interest in avoiding voter confusion, preventing the clogging of the election machinery, assuring that the winner of an election is the choice of the majority, protecting against frivolous candidacies, and preserving the stability of the two-party system. Each of these interests was also asserted in *Anderson* and found inadequate to justify the burden imposed there. *See id.* at 796–806, 103 S.Ct. at 1574–79. We are compelled to reach the same conclusion here, especially since the Secretary has been unable to articulate how achieving these goals makes it at all necessary or desirable to require alternative party candidates to file almost seven months before the general election.

It is important to emphasize that the Secretary does not claim that New Jersey's early filing deadline is justified by administrative necessity. The Secretary has no difficulty processing nomination petitions for alternative party presidential candidates, even though such candidates need not file until late July. No argument has been made that a longer period is needed to process petitions from candidates for state office.

In short, the Secretary has advanced no state interests which in any way justify requiring plaintiffs to file their nominating petitions at the same early date as Democratic and Republican candidates. Thus, in applying the *Anderson* balancing analysis, we find nothing to weigh on the Secretary's side. While we suspect that, because of the low number of signatures New Jersey requires, the overall burden on plaintiffs' rights is less severe than that typically involved in cases successfully challenging ballot access laws,[4] weighing that burden against the lack of state interests justifying it compels us to conclude that plaintiffs have established a reasonable probability that they will prevail on the merits of their claim.[5]

---

**4.** *See, e.g., Anderson*, 460 U.S. at 783 n. 1, 103 S.Ct. at 1567 n. 1 (striking down Ohio requirements that nominating petitions be signed by at least 5000 qualified voters and be filed by March 20); *Rockefeller v. Powers*, 78 F.3d 44 (2d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 1704, 134 L.Ed.2d 802 (1996) (invalidating New York's presidential primary provisions effectively requiring candidates to obtain signatures from

more than 5% or 1250 registered party members in each of 31 districts, during period of just 37 days, subject to numerous highly technical requirements).

**5.** While relatively low signature requirements do lessen the burden on candidates seeking the attention of an often disinterested public, they do nothing to reduce the burden that an early filing

In agreeing with the district court that plaintiffs are likely to succeed on the merits, we reject three counter arguments raised by the Secretary. First, the Secretary argues that *Anderson*'s applicability is limited to national elections and is not controlling where, as here, the challenge is to a provision governing state elections. While it is true that *Anderson* concerned a presidential candidacy, and that the Court gave some consideration to how one state's early filing deadline for presidential candidates burdens voters in all states, *see id.* at 794–95, 804, 103 S.Ct. at 1572–73, 1578, there is no indication in the Court's opinion that these factors were integral to its holding.

While there may be additional or different factors to be considered in the context of a federal election when a court is assessing the extent and nature of the burdens imposed and the specific governmental interests said to justify those burdens, we perceive no reason why a challenge to an early filing deadline in the context of a state election should occasion a different mode of constitutional analysis. The Supreme Court apparently agrees. Since *Anderson*, it has consistently applied the *Anderson* balancing test to cases involving state elections. *See, e.g., Timmons v. Twin Cities Area New Party,* —— U.S. ——, ——, 117 S.Ct. 1364, 1370, 137 L.Ed.2d 589 (1997); *Burdick v. Takushi,* 504 U.S. 428, 434, 112 S.Ct. 2059, 2063–64, 119 L.Ed.2d 245 (1992). Thus, while there were additional factors that went into the weighing process in *Anderson* because a federal election was involved, when we apply the same test to the burdens and justifications cited here, we can only conclude that the former

outweigh the latter. We find support for our approach in the vast majority of post-*Anderson* cases that have considered challenges to early filing deadlines for state elections.[6]

Next, the Secretary observes that numerous candidates of alternative political parties have succeeded in gaining access to New Jersey's ballot and that the overall burden imposed by the state's ballot access scheme is small. *See* App. 91. We agree that the success of these candidates suggests, as we have said, that the overall burden of achieving ballot access in New Jersey is not as severe as in some other states. However, this in no way detracts from our conclusion that the April filing deadline is burdensome. In *Anderson,* five independent candidates qualified for Ohio's 1980 presidential ballot. *See* 460 U.S. at 791 n. 12, 103 S.Ct. at 1571 n. 12. Neither there nor here can the fact that numerous candidates are able to overcome a burden on ballot access prevent a conclusion of unconstitutionality where that burden is not sufficiently justified by legitimate state interests. *See id.*

Finally, the Secretary claims that effectively imposing a July filing deadline for candidates of alternative political parties while holding major party candidates to an April deadline involves the state in treating some candidates more favorably than others. But alternative party candidates and major party candidates are not similarly-situated. Because Democrats and Republicans will participate in June primaries, there are valid reasons of administrative necessity and voter

---

deadline places on voters who wish to react to events occurring after the deadline. For example, due to the April deadline, voters dissatisfied with the primary results and desiring a broader candidate choice cannot work together to create such a choice. As long as the early deadline is in place, voters would remain burdened in this way even if nominating petitions required only one signature.

**6.** *See, e.g., Cromer v. State of South Carolina,* 917 F.2d 819, 822 (4th Cir.1990) ("[W]e specifically reject the state's contention here that [*Anderson*] applies only to ballot access restrictions upon candidates for national office."); *Goldman–Frankie v. Austin,* 727 F.2d 603, 607 (6th Cir. 1984); *Cripps v. Seneca County Bd. of Elections,*

629 F.Supp. 1335, 1347–48 (N.D.Ohio 1985); *Stoddard v. Quinn,* 593 F.Supp. 300, 304 & n. 6 (D.Me.1984). Although one circuit appears to have reached a contrary conclusion, *see Stevenson v. State Bd. of Elections,* 794 F.2d 1176 (7th Cir.1986), *aff'g* 638 F.Supp. 547, 552 (N.D.Ill. 1986), and two others have suggested that the national impact of a presidential election was important to the *Anderson* holding, *see Rainbow Coalition of Oklahoma v. Oklahoma State Election Bd.,* 844 F.2d 740, 743, 746 n. 9 (10th Cir.1988); *Dart v. Brown,* 717 F.2d 1491, 1503–04 (5th Cir.1983), these courts nonetheless applied the *Anderson* balancing analysis to the state election challenges before them.

education for requiring these candidates to file petitions in April. Such reasons do not apply to alternative party candidates who cannot compete in primaries and will not appear on any ballot until November. As *Anderson* explained, "'[s]ometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike.'" *Id.* at 801, 103 S.Ct. at 1576 (quoting *Jenness v. Fortson,* 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971)). Given the differences in burdens and benefits that the early filing deadline causes for alternative party candidates and for major party candidates, *see id.* at 800–01, 103 S.Ct. at 1571, the inequity is in applying the same uniform filing deadline to all candidates.

■ Having concluded that requiring plaintiffs to file their petitions by April 10 likely violates their constitutional rights, it clearly follows that denying them preliminary injunctive relief will cause them to be irreparably injured. Plaintiffs' voting and associational rights are burdened by their inability to nominate, support, and vote for candidates who represent their beliefs. If the plaintiffs lack an adequate opportunity to gain placement on the ballot in this year's election, this infringement on their rights cannot be alleviated after the election.

■ While we agree with the district court that the plaintiffs have established a likelihood of success on the merits and will be irreparably harmed from denial of preliminary relief, we part company with the district court on the remaining two preliminary injunction factors. The district court found, without further explication, that because the 1997 electoral process is already well underway, "defendant would suffer considerable injury from the grant of a preliminary injunction [which would] inject[ ] confusion and disarray into the November ballot." Slip op. at 22. We may only reverse the district court's factual conclusion if it is "clearly erroneous," which is the case when the conclusion lacks adequate evidentiary support in the record. *See Davin v. United States Dep't. of Justice,* 60 F.3d 1043, 1049 (3d Cir.1995).

The court's conclusory statement about harm to this November's election is entirely unsupported in the record. Indeed, the Secretary did not argue below that preliminary relief should be denied on this basis, and before us the Secretary is unable to cite to a single piece of record evidence justifying the district court's finding. Nor has the Secretary referred us to any case involving a challenge to a ballot access provision in which preliminary relief was denied solely because an election was impending. In fact, the authorities are quite to the contrary, as the Supreme Court and the lower federal courts have not been averse to granting preliminary relief close to an election when plaintiffs have demonstrated an entitlement to such relief.[7] Further, as we explained in the context of the *Anderson* balancing analysis, the state has failed to demonstrate it has any interests which in any way require an April-filing deadline for candidates of alternative political parties. Thus, we cannot agree with the district court that the harm to the Secretary from grant of preliminary relief is greater than the harm to plaintiffs from denial of that relief.

■ Finally, the public interest also favors granting plaintiffs preliminary relief. In the

---

7. *See, e.g., Norman v. Reed,* 502 U.S. 279, 287, 112 S.Ct. 698, 704, 116 L.Ed.2d 711 (1992) (Supreme Court preliminarily reversed state supreme court's denial of desired ballot space, and granted stay pending review, less than two weeks before election); *Illinois State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 177, 179, 99 S.Ct. 983, 986, 987, 59 L.Ed.2d 230 (1979) (affirming lower court and noting that on March 14, 1977 district court enjoined enforcement of unconstitutionally high signature requirements for June 7, 1977 special election); *Bullock v. Carter,* 405 U.S. 134, 136, 92 S.Ct. 849, 852, 31 L.Ed.2d 92 (1972) (noting that district court decided on April 3, 1970 that petitioners must be permitted to participate in party primary on May 2, 1970, even though they had not paid filing fee that court found to be unconstitutional); *Rockefeller,* 78 F.3d at 44 (affirming preliminary injunction—easing New York presidential primary petition requirements and requiring addition of candidates' names to ballots—entered by district court on February 21, 1996, less than three weeks before March 7, 1996 primary); *Republican Party of North Carolina v. Hunt,* 841 F.Supp. 722 (E.D.N.C.), *aff'd and modified,* 27 F.3d 563 (4th Cir.1994) (table) (granting preliminary injunction in January, extending February filing deadline for judicial candidates for November ballot).

absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights, including the voting and associational rights of alternative political parties, their candidates, and their potential supporters. Since there is no basis for concluding that preliminary relief will negatively impact the November 1997 election, these constitutional rights can and should be protected immediately, consistent with the public interest.

## III.

Because all four factors favor granting plaintiffs preliminary relief, the district court's decision denying that relief was not consistent with the sound exercise of discretion. Thus, we will reverse the district court's denial of such relief and enter an order directing the district court to issue a preliminary injunction requiring the Secretary to accept any nominating petitions submitted on or before July 28, 1997 by a named candidate plaintiff or by a candidate of a political party plaintiff.

SCIRICA, Circuit Judge, dissenting.

I would affirm the denial of the preliminary injunction, but for reasons different from those set forth by the district court. I do not believe plaintiffs can prove a substantial likelihood of success on the merits.

In *Timmons v. Twin Cities Area New Party*, —— U.S. ——, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997), the Supreme Court recognized that states possess a "strong interest in the stability of their political systems" and an "interest in protecting the integrity, fairness, and efficiency of their ballots and election processes." *Id.* at ——, 117 S.Ct. at 1373–74. Repeatedly characterizing these interests as "weighty," *id.* at ——, 117 S.Ct. at 1375, the Court held that "the States' interest permits them to enact reasonable election practices that may, in practice, favor the traditional two party system . . . and that

temper the destabilizing effects of party-splintering and excessive factionalism." *Id.* at ——, 117 S.Ct. at 1374. For this reason, "States need not remove all of the many hurdles third parties face in the American political arena today." *Id.* The Court found support for this position in a long line of decisions upholding state regulations of elections for state offices that place burdens on third parties and independent candidates. *See, e.g., Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992) (upholding state's ban on write-in voting); *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974) (upholding state statute denying ballot positions to independent candidates who had voted in the immediately preceding primary elections or had a registered party affiliation at any time during the year before the same primary elections); *Rosario v. Rockefeller*, 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) (upholding state time limit for enrollment in political party; regulation justified by state's interest in integrity of state's electoral process).

The New Jersey statute on review here is reasonable, placing only a minimal non-discriminatory burden on independent/third party candidates for state office. The statute requires independent/third party candidates for the state Senate and General Assembly to obtain 100 petition signatures, and candidates for governor 800 signatures, by mid-April of the election year, in order to appear on the general election ballot.[1] The number of signatures is the same or less than required for major party candidates who wish to be on the primary election ballot. The deadline for petition filing is the same for both major party and independent/third party candidates. Moreover, candidates may begin to collect signatures immediately after the prior November general election. Unlike candidates for primary nominations, independent/third party candidates are allowed to collect signatures from voters of any affilia-

---

1. Because two persons are elected for each new Jersey General Assembly district, and New Jersey allows two candidates for the same district to file a joint petition with 100 signatures, an independent candidate for the General Assembly can gain access to the general election ballot after collecting only 50 signatures. The joint petition

option was used this year by the candidates of the New Jersey Conservative Party in the 1st, 3rd, 4th, 7th, 9th, 10th, 11th, 12th, 13th, 16th, 17th, 21st, 22nd, 24th, 25th, 26th, 28th, 30th, 32nd, 34th, 37th, 39th, and 40th legislative districts.

tion, Democratic, Republican, independent, and unaffiliated, a practice prohibited in many states. New Jersey also permits write-in voting, so candidates who fail to meet the minimal filing requirements may still run for office.[2]

Because the filing deadlines and signature requirements for independent/third party candidates are the same or less burdensome than those required for major party candidates, I see no unfair or unequal burden. More important, the burden has proved to be slight. Hundreds of independent candidates have surmounted these minimal barriers and appeared on the state's general election ballots. This year, eight independent or third party candidates for governor, twenty-five independent/third party candidates for the state Senate, and sixty-eight independent/third party candidates for the General Assembly successfully petitioned to be on the ballot in the general election. Similar numbers of independent or third party candidates were on the ballot in recent past elections. In 1993, sixty-six independent/third party candidates appeared on the general election ballot, including seventeen for governor, two for state Senate, and forty-seven for the General Assembly. In 1994, thirty-three independent/third party candidates were on the ballot; in 1995, eighty-two independent/third party candidates appeared on the ballot; in 1996, fifty-eight appeared.

One of the strongest indications that New Jersey's ballot access laws establish no unreasonable barriers to political participation is that five of the individual plaintiffs here successfully filed petitions this year, and will appear on the general election ballot in November 1997.[3] Moreover, four of the plaintiff political parties—the Green Party, the Libertarian Party, the New Jersey Conservative Party, and the Natural Law Party—

successfully placed gubernatorial candidates on the 1997 general election ballot. It seems inconsistent for plaintiffs to argue that New Jersey's election laws place serious barriers to political participation when they have easily satisfied those requirements.

These extraordinary results demonstrate that New Jersey's election scheme places no real burden on independent/third party candidates seeking access to the ballot. Though the majority asserts that these facts "in no way detract[ ] from our conclusion that the April filing deadline is burdensome," the burdens of the filing deadlines are either shared by the major party candidates or are illusory. Indeed, the specific alleged burden on which plaintiffs relied before the district court—the difficulty in obtaining signatures from "disinterested voters" during "cold" winter months—is shown to be no burden at all when the empirical record is examined.

New Jersey's statute, both in the number of signatures required and the filing date, is justified by the state's interests in limiting frivolous candidacies and maintaining a stable and efficient election process. Because the deadline for filing for office is the same for all candidates, it serves the state's interest in a fair process. Though independent candidates must file for election before knowing who the major parties have nominated, this ensures that candidates are not "sore losers" seeking access to the general election ballot as independents in response to a loss in a primary election.

Moreover, the current system insures that primary election voters know the complete field of independent/third party candidates when they cast their votes, adding to the stability of the electoral process and the informed character of the voters' choices. In short, "weighty" state interests support New Jersey's statute. *See generally Anderson v.*

---

2. By allowing write-in voting, which many states prohibit, New Jersey provides a significant benefit to candidates who fail to file petitions because they decide to run late in the election cycle or who are unable to collect the requisite number of signatures by the filing deadline.

3. Plaintiff Madelyn Hoffman will appear on the general election ballot as the gubernatorial candidate for the Green Party. Plaintiff Mary Jo Christiansen is the Natural Law Party candidate

for state Senate, 11th legislative district. Plaintiff Sal Duscio is the New Jersey Conservative Party candidate for the General Assembly, 30th legislative district. Plaintiff Jeffrey Levine is the Natural Law Party candidate for state Senate, 27th legislative district. Plaintiff Bernard C. Sokolewski is the New Jersey Conservative Party candidate for state Senate, 38th legislative district.

*Celebrezze*, 460 U.S. 780, 788, 103 S.Ct. 1564, 1569–70, 75 L.Ed.2d 547 (1983) ("[T]he state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions.").

Plaintiffs argue, and the majority agrees, that *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), striking down Ohio's March filing deadline for independent Presidential candidates, is dispositive. But *Anderson* involved state regulation of the Presidential election, a contest of national interest. Although the majority contends this factor was not "integral" to the Court's holding, I believe this was a crucial factor. The *Anderson* Court repeatedly stressed that the state's interest was not substantial because it sought to regulate a Presidential election of national import. *Id.* at 790, 794–95, 796, 798, 804, 103 S.Ct. at 1571, 1573, 1574, 1575, 1578. The Court expressly noted that the state's interest is greater in cases where the state seeks solely to regulate elections for state offices. *Id.* at 804, 103 S.Ct. at 1578. Here, the New Jersey statute only regulates elections for state offices; it has no impact on Presidential or Congressional races. Moreover, the filing deadline here is later than that in *Anderson*, and far fewer signatures are required.

The majority acknowledges that state "sore loser" laws have been upheld by the Supreme Court. The current New Jersey statute prevents major party candidates who lose the primary election from running as independents in the general election. The majority would require New Jersey's Secretary of State to accept ballot petitions up to July 28, weeks after the state's primaries are held. In the future, candidates will be able to file and run as independents after losing a major party's primary election.

New Jersey has placed minimal restrictions on independent and third party candidates. Under its current rules, hundreds of independent candidates have appeared on the ballot in recent years. *Timmons* and *Anderson* recognize that states have significant interests, and correspondingly greater latitude, when they regulate election to state office.

Accordingly, I respectfully dissent.