RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0212p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LIBERTARIAN PARTY OF KENTUCKY; LIBERTARIAN NATIONAL COMMITTEE, INC.; KEN MOELLMAN, JR.; CONSTITUTION PARTY OF KENTUCKY,

        *Plaintiffs-Appellants*,

    *v.*

ALISON LUNDERGAN GRIMES, Secretary of State of the Commonwealth of Kentucky; JOSHUA G. BRANSCUM, JOHN HAMPTON, STEPHEN HUFFMAN, DONALD BLEVINS, JR., ALBERT B. CHANDLER, III, and GEORGE RUSSELL, Members of the State Board of Elections; MARYELLEN B. ALLEN, Executive Director, Kentucky State Board of Elections; ANDREW G. BESHEAR, Attorney General, all in their official capacities,

        *Defendants-Appellees*.

No. 16-6107

Appeal from the United States District Court
for the Eastern District of Kentucky at Frankfort.
No. 3:15-cv-00086—Gregory F. Van Tatenhove, District Judge.

Decided and Filed:  August 26, 2016

Before:  MERRITT, BOGGS, and McKEAGUE, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Christopher Wiest, Robert A. Winter, Jr., CHRIS WIEST, AAL, PLLC, Crestview Hills, Kentucky, for Appellants.  Jonathan T. Salomon, Katherine Lacy Crosby, TACHAU MEEK PLC, Louisville, Kentucky, for Appellee Grimes and Board of Elections Appellees.  S. Travis Mayo, Matt James, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, for Appellee Beshear.

_____

**OPINION**

_____

BOGGS, Circuit Judge.   Appellants are the Libertarian Party of Kentucky, the Libertarian National Committee, the Constitution Party of Kentucky, and Ken Moellman, Jr., an individual voter and former Libertarian Party candidate for Kentucky state office.   The gravamen of appellants' complaint is that Kentucky law unconstitutionally burdens appellants' First and Fourteenth Amendment rights to freedom of political association and equal protection by categorizing the Libertarian Party and Constitution Party as "political groups," which must petition to list their candidates for state and local office on election ballots, rather than as "political parties" or "political organizations," which enjoy "blanket" ballot access for all the candidates they nominate.   The district court concluded that the Commonwealth of Kentucky's three-tiered ballot-access scheme was a constitutional means of exercising the Commonwealth's power to regulate elections.   We affirm.

I

The Commonwealth of Kentucky classifies a political association as (1) a "political party" if it received at least twenty percent of the total vote cast in the last presidential election, (2) a "political organization" if it received at least two percent of the vote of the state in the last presidential election, or (3) a "political group" if it fails to qualify as a "political party" or a "political organization."   Ky. Rev. Stat. § 118.015.   Political candidates who are members of a political party or political organization may gain ballot access by winning their party's nomination at a convention or in a primary election.   *Id.* §§ 118.305, .325, .105.   Members of a political group, on the other hand, must obtain voters' signatures on a qualifying petition in order to gain ballot access.   *Id.* § 118.305(1)(d).   The signature requirement is 5,000 for a statewide office; 400 for the United States House of Representatives; 100 for a county officer, member of the Kentucky General Assembly, or Commonwealth's Attorney; and twenty-five or fewer for various other local offices.   *Id.* § 118.315(2).   Individuals may sign more than one petition for the same office only if each petition nominates a soil and water conservation district supervisor (of which seven are elected to staggered terms for each of Kentucky's 120 counties); in all other cases, if an individual signs multiple petitions for the same office, only the signature on the first

petition to be filed is counted. *Ibid.* Petitioning may begin approximately one year preceding the election for which a candidate seeks ballot access, and petitions must be filed with the Secretary of State or county clerk by the second Tuesday in August preceding the election, allowing approximately nine months for candidates to gather signatures. *Id.* § 118.365(5).

Appellants' argument is essentially this: the two-percent requirement for blanket party access to the general-election ballot is "impossible, or virtually impossible" to satisfy, and the alternative means of fielding candidates by petition is unconstitutionally burdensome—not as applied to any individual candidate for a specific office, but rather as applied to the Libertarian Party and Constitution Party as political associations, because these associations must incur high costs of gathering and filing petitions in order to field a slate of candidates for state and local office. Appellants' Br. 11. Appellants argue that by allowing political parties and organizations blanket ballot access without the need for petitioning, and by requiring groups like the Libertarian Party and Constitution Party to incur heavy burdens by filing petitions, the Commonwealth's ballot-access laws deny appellants equal protection and "appear designed" to "keep candidates other than the Democrat and Republican candidates off the ballot." *Id.* at 23. Appellants challenge the Commonwealth's laws "both facially and as applied," *id.* at 29, and appellants' arguments "have characteristics of as-applied and facial challenges." *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 692 (6th Cir. 2015) (citing *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010)).

We have previously held that the 5,000-signature requirement to petition for statewide-office ballot access is consistent with the Equal Protection Clause. *Anderson v. Mills*, 664 F.2d 600, 606–07 (6th Cir. 1981). The Eastern District of Kentucky has also upheld the 5,000-signature requirement in a challenge under the First and Fourteenth Amendments involving appellant Libertarian Party of Kentucky. *Libertarian Party v. Davis*, 601 F. Supp. 522, 523–25 (E.D. Ky. 1985). Both cases involved challenges arising from the denial of ballot access to specific candidates. We have not yet, however, evaluated the constitutionality of the two-percent requirement for *blanket* party access to the general-election ballot under either the First Amendment or the Fourteenth Amendment, nor have we evaluated the constitutionality of the

petitioning requirements as applied to a political association as a whole.[1]  We do so today, following the well-established *Anderson-Burdick* framework, which "serves as 'a single standard for evaluating challenges to voting restrictions.'"  *Green Party of Tenn. v. Hargett*, 791 F.3d at 692 (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012)).

II

The United States Supreme Court, in *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992), established a three-step framework for evaluating state restrictions on ballot access.  The first step of *Anderson-Burdick* is to consider the "character and magnitude" of the restriction: "severe" restrictions are subject to heightened scrutiny, "minimally burdensome" restrictions are subject to rational-basis review, and regulations falling in the middle warrant a "flexible analysis" that weighs the state's interests and chosen means of pursuing them against the burden of the restriction.  *Green Party of Tenn. v. Hargett*, 767 F.3d 533, 544 (6th Cir. 2014) (citing *Anderson* and *Burdick*).  The second step is to "identify and evaluate" the state's interests and justifications for its restrictions.  *Id.* at 546.  The third step is to assess the "legitimacy and strength" of those interests to determine whether the restrictions are constitutional burdens on ballot access.  *Ibid.*

---

[1]Appellants challenge the effect on the Libertarian Party and the Constitution Party of the various petitioning requirements (and not only the 5,000-signature requirement to petition for a nominee to statewide office), including the requirement in most cases to file a separate petition with unique signatures for each nominee rather than filing a single petition per election year.  Notably, the number of signatures required for each petition is both relatively modest and roughly congruent to the number of registered voters in the political unit represented by each corresponding political office: 5,000 signatures for statewide office, for instance, represents roughly 0.15% of the 3,261,183 voters registered in Kentucky as of August 2016, State Bd. of Elections, Commonwealth of Ky., *Voter Registration Statistics Report* (2016) (August report by district), http://elect.ky.gov/statistics/Documents/voterstatsdistrict-20160811-031801.pdf; 400 signatures for the United States House of Representatives represents just under 0.1% of the number of voters registered in each of Kentucky's six congressional districts; and 100 signatures for the Kentucky General Assembly represents roughly 0.3% of the number of voters registered in each of Kentucky's 100 house districts and roughly 0.1% of the number of voters registered in each of Kentucky's thirty-eight senate districts.  *Ibid.*  While there is surely some variance in the ratio of required signatures to registered voters at the county-or-lower level (since the signature requirements are fixed, while the number of registered voters per county ranges from 1,734 in Robertson County to 573,650 in Jefferson County), there is likely also variance in the difficulty of obtaining signatures depending on factors such as whether a county is predominantly urban or rural, and in any event the requirements of 100 or fewer signatures for county- or lower-level offices do not impose a severe burden for the reasons we set forth below.  State Bd. of Elections, Commonwealth of Ky., *Voter Registration Statistics Report* (2016) (August report by county), http://elect.ky.gov/statistics/Documents/voterstatscounty-20160811-031759.pdf.

A

At the first step, we hold that the burden of the Commonwealth's ballot-access restrictions on appellants is not "severe." The hallmark of a severe burden is exclusion or virtual exclusion from the ballot. *Compare Lubin v. Panish*, 415 U.S. 709, 719 (1974) (striking $701.60 filing fee for ballot-access petition because it excluded indigent candidates from running for office with no reasonable alternative means of access), *and Williams v. Rhodes*, 393 U.S. 23, 24, 35 (1968) (striking "series of election laws," including requirement that minor political parties file a petition signed by the number of voters equal to fifteen percent of the votes cast in the preceding gubernatorial election, because it "made it virtually impossible" for any party other than the Republican Party and Democratic Party to gain ballot access), *with Jenness v. Fortson*, 403 U.S. 431, 438 (1970) (upholding a requirement that five percent of all registered Georgia voters sign candidate's petition for ballot access and noting that even serious restrictions on third parties' ballot access are generally upheld unless they truly operate to "freeze the political status quo").

In some circumstances, the "combined effect" of ballot-access restrictions can pose a severe burden. *Citizens to Establish a Reform Party v. Priest*, 970 F. Supp. 690, 699 (E.D. Ark. 1996) (citing *Republican Party of Ark. v. Faulkner*, 49 F.3d 1289 (8th Cir. 1995)); *see Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 582–83 (6th Cir. 2006) (striking down Ohio regulatory scheme where minor political parties could gain general-election ballot access only if they both participated in the March primary and—120 days prior to the March primary—filed a petition with signatures equal to one percent of the votes cast in the previous statewide election); *see also Jenness*, 403 U.S. at 442 (noting that Georgia's higher-than-most five-percent signature requirement was "balanced by the fact that Georgia has imposed no arbitrary restrictions whatever" on voters who want to sign multiple petitions). A very early filing deadline, for example, combined with an otherwise reasonable petitioning requirement, can impose a severe burden, especially on independent candidates or minority parties that must gather signatures well before the dominant political parties have declared their nominees. *See, e.g., Storer v. Brown*, 415 U.S. 724, 739–40 (1974) (remanding for further factual development where a California requirement that a party obtain approximately 325,000 signatures on a petition within a twenty-four-day period may have posed a severe burden); *Council of*

*Alternative Political Parties v. Hooks*, 121 F.3d 876, 880 (3d Cir. 1997) (holding that a filing deadline fifty-four days before the primary election was an unconstitutional burden); *McLain v. Meier*, 637 F.2d 1159, 1163–64 (8th Cir. 1980) (finding "particularly troublesome" a filing deadline ninety days before the primary election); *Priest*, 970 F. Supp. at 697–98 (concluding that a filing deadline in January, more than four months before the primary election, was an "unreasonable burden").

The burden of the Commonwealth's ballot-access scheme on appellants thus falls well short of "severe": while the blanket-access requirement of gaining two percent of the votes in a presidential election may impose some financial costs on the Libertarian Party and the Constitution Party to the extent that meeting the threshold may require greater campaign efforts, those costs certainly do not constitute exclusion or virtual exclusion from the ballot. After all, the requirement that a minor party secure two percent of the actual votes cast in a presidential election is not substantially different from a requirement that a party secure signatures of two percent of the registered voters in a jurisdiction: indeed, the absolute number of votes required (35,944 out of 1,797,212 cast in the 2012 election, for example) is significantly lower than the number of signatures that would be required under a regulation that required the signatures of two percent of registered voters (65,224 out of 3,261,183)—and even such a burden would fall well below the five-percent requirement that the Supreme Court upheld in *Jenness*, 403 U.S. at 442. See State Bd. of Elections, Commonwealth of Ky., *Official 2012 General Election Results* (2012), http://elect.ky.gov/SiteCollectionDocuments/Election%20Results/2010-2019/2012/2012genresults.pdf; State Bd. of Elections, Commonwealth of Ky., Voter Registration Statistics Report (2016) (August report by district), http://elect.ky.gov/statistics/Documents/voterstatsdistrict-20160811-031801.pdf.

Further, the two-percent requirement for blanket ballot access cannot constitute exclusion or virtual exclusion because blanket access is only one of two ballot-access mechanisms. The alternative option of filing petitions for each candidate's candidacy remains, as we have held before, *see Anderson v. Mills*, 664 F.2d at 606–07, a reasonable means of ballot access.

Although appellants argue that meeting the two-percent requirement "is impossible, or virtually impossible," Appellants' Br. 11, third parties in Kentucky have done exactly that several times in recent election cycles: the American Party in 1968, the Anderson Coalition in

1980, and the Reform Party in 1996. Appellants contend that "if [a] party is only interested in state politics," it is "impossible" for such a party to gain blanket ballot access. Appellants' Br. 12 (citing the Progressive Party of Vermont, which has eight state legislators but does not field any presidential candidates, as an example of the sort of political group that would find it very difficult to gain blanket ballot access under a statute like Kentucky's). But while that argument may have some force, since a party that failed ever to field a presidential candidate would be unable to gain two percent of the votes in a *presidential* election, the hypothetical burden of Kentucky's regulation on a hypothetical party has no bearing on appellants, and we do not decide how severe, if at all, such a burden would be.

Moreover, appellants have not demonstrated that the "combined effect," *Priest*, 970 F. Supp. at 699, of the Kentucky regulation is to impose a severe burden on their access to the ballot. Indeed, the Libertarian Party has satisfied the petitioning requirement and fielded a candidate for President of the United States in every presidential election since 1988. Even the Constitution Party—which boasts fewer than 400 registered voters in Kentucky—has placed a presidential candidate on the ballot in 2000, 2004, and 2008. See State Bd. of Elections, Commonwealth of Ky., *Voter Registration Statistics Report* (2016) (August report by district), http://elect.ky.gov/statistics/Documents/voterstatsdistrict-20160811-031801.pdf. Unlike the pre-primary filing deadlines in Hooks, 121 F.3d at 880, *McLain*, 637 F.2d at 1163–64, and *Priest*, 970 F. Supp. at 698, Kentucky allows political groups to file petitions for candidacy three months before the general election, and provides such groups approximately nine months to gather a quantity of signatures that amounts in almost all cases to less than 0.3% of the number of registered voters in the political unit that corresponds to each office. Ky. Rev. Stat. §§ 118.365(5), .315(2).

Appellants further argue that the burden of the regulation is severe because of the cost on the party of filing separate petitions for each office for which the party wishes to field a candidate. Appellants argue that if they wished to field a candidate for every state and county office over a four-year term,[2] the cost of petitioning would be as much as $734,328: $2 per

---

[2]Notably, over the four-year term including the 2017–2020 election years, appellants would have to field candidates for a total of 2,590 offices: 2,457 offices for the 2018 election, six for the 2019 election, and 127 for the 2020 election. Nothing in the record would indicate that appellants have ever sought or now seek to nominate candidates to anywhere near that number of offices over a four-year term.

signature for the 367,164 unique signatures that appellants claim would be required to satisfy the petitioning requirements for every office while maintaining a "safety factor" of 1.75.[3] Appellants compare this to the filing fee that the Supreme Court struck down in *Lubin*, 415 U.S. at 719. Appellants' Br. 31–32. But appellants cite figures based on the market rate charged by "professional petitioners" to gather signatures, even though nothing in the Kentucky regulation requires the use of such professionals. *Id.* at 16. And again, appellants present the hypothetical maximum cost of petitioning without demonstrating any likelihood that appellants would actually field a full slate of candidates for every state and county office during an actual four-year term. Thus, unlike the mandatory filing fee in Lubin, the incidental costs of gathering signatures on petitions do not come close to exclusion from the ballot, and thus do not impose a severe burden on ballot access.

Having concluded that the burden on appellants is not so "severe" as to warrant strict scrutiny, we also conclude that the burden is not so "minimal" as to warrant rational basis review. *Green Party of Tenn. v. Hargett*, 767 F.3d at 546 (citing *Burdick*, 504 U.S. 428). A burden is minimal when it "in no way limit[s] a political party's access to the ballot." *Libertarian Party of Ohio v. Blackwell*, 462 F.3d at 587 (citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 354 (1997) (holding "minimal" any burden imposed by a regulation that prohibited an individual from appearing on the ballot as the candidate for more than one party), and *Clingman v. Beaver*, 544 U.S. 581, 593 (2005) (upholding statute allowing only registered members of a party and registered independents to vote in a primary election)). Here, the burden of the Kentucky regulation on appellants is at least somewhat greater than minimal because appellants must either earn sufficient votes in a presidential election to gain political-organization status, presumably at more-than-minimal cost in terms of time, effort, and money, or engage in petitioning that is not required of major political parties, with the result that minor parties will necessarily spend time, effort, and money gathering signatures that they could otherwise spend campaigning for candidates. To the extent that a minor party therefore fields fewer candidates or earns fewer votes than it would if it enjoyed blanket ballot access without having to earn it, the Kentucky regulation imposes a more-than-minimal burden. Since the

---

[3]Safety factor refers to the ratio of actual signatures gathered to signatures required. Candidates generally gather more signatures than required to hedge against the risk of invalid or duplicate signatures. Appellants' Br. 1–2.

Kentucky regulation thus falls somewhere "in between" minimal and severe, *Green Party of Tenn. v. Hargett*, 767 F.3d at 546, we will next engage in the "flexible analysis," *Anderson v. Celebrezze*, 460 U.S. at 789, that the district court rightly employed.

B

At the second step of *Anderson/Burdick*, we hold that Kentucky has an important interest in ensuring that candidates demonstrate a "significant modicum of support," *Jenness*, 403 U.S. at 442, before gaining access to the ballot, primarily in order to avoid voter confusion, ballot overcrowding, and frivolous candidacies.

Under Article I, Section 4, of the United States Constitution, it falls to the states to prescribe the "times, places and manner of holding Elections," subject to some federal oversight. U.S. Const. art. I, § 4, cl. 1. The Supreme Court has held that "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some order, rather than chaos, is to accompany the democratic process." *Storer*, 415 U.S. at 730 (finding a significant state interest in avoiding ballot confusion to be a valid justification for requiring independent candidates to be politically disaffiliated with other parties for one year before the primary election); *see also Timmons*, 520 U.S. at 364, 366 (noting that "[s]tates certainly have an interest in protecting the integrity, fairness, and efficiency of their ballots and election processes as means for electing public officials" and that states have a "strong interest in the stability of their political systems").

The Commonwealth of Kentucky has asserted interests in avoiding the voter confusion, ballot overcrowding, and frivolous candidacies that would likely arise in increasing frequency as the number of parties with blanket ballot access increased. The district court rightly noted that the privilege of blanket access is significant, for any party with blanket access may field as many candidates as it nominates to every state and local election for a four-year term, adding a potentially great number of candidates to ballots statewide. The interests cited are central to the regulation of elections: for example, much of the controversy attendant to the 2000 presidential election in Florida was occasioned by the fact that Florida permitted ten parties to be included on the presidential ballot, leading to a variety of confusing and unorthodox ballot designs that would not have been necessary with a smaller number of parties. Thus, the Commonwealth may

sensibly require the kind of broad-level support that is measured by a political group's ability to garner two percent of the vote in a presidential election.

C

Finally, at step three of *Anderson/Burdick*, we hold that the Commonwealth of Kentucky's legitimate interests in regulating elections are sufficiently strong to justify its chosen means of achieving them, even if less restrictive means might be available. Appellants contend that rather than requiring political groups to obtain two percent of the votes in a presidential election in order to enjoy blanket ballot access, Kentucky should alternatively allow mid-term or gubernatorial election results to qualify a political association as a political party or organization. Appellants' Br. 13. Our job, however, is not to second-guess the legislative decisions of the Kentucky General Assembly but only to evaluate whether those decisions pass constitutional muster, and for the reasons discussed above in Parts II-A and II-B, the strength of Kentucky's interests in avoiding voter confusion, ballot overcrowding, and frivolous candidacies outweighs the modest burden of the ballot-access regulations on appellants.

As for the petitioning requirement, appellants argue that they should be able to file a single petition rather than separate petitions for each candidate. While such a scheme would almost certainly require less time and effort of appellants if they chose to field many candidates in a given election year, it is not the system that Kentucky has chosen and that we now uphold.

III

We also affirm the district court's grant of Attorney General Beshear's motion to dismiss. The district court properly held that the Attorney General was not a proper defendant because the Attorney General's general enforcement powers did not provide a basis on which to grant appellants relief.

Accordingly, the district court's judgment is AFFIRMED.