GIBBONS, J., delivered the opinion of the court. CLAY, J. (pp. 595-601), delivered a separate opinion concurring in part and dissenting in part. GRIFFIN, J. (pp. 601-609), delivered a separate dissenting opinion.
OPINION
JULIA SMITH GIBBONS, Circuit Judge.
The Libertarian Party of Ohio (“LPO”), its chairperson, vice-chairperson, and a member who sought to be listed as a candidate appeal the district court’s order denying their motion for summary judgment and granting summary judgment in favor of defendant J. Kenneth Blackwell, the *582 Secretary of State of Ohio (“Secretary” or “State”). The LPO’s first claim is that Ohio’s policy mandating strict compliance with election laws violates the Constitution. As we find this claim to be moot, we do not have jurisdiction to address it. The LPO’s second claim, which is not moot, is that the combination of two Ohio election regulations — the requirement that all political parties nominate their candidates via primary election and the requirement that all minor political parties file a petition with the Secretary 120 days in advance of the primary — imposes an unconstitutional burden on its First and Fourteenth Amendment rights of free association, by effectively preventing it from gaining access to the general election ballot in the twelve months preceding a presidential election. Following the analytical framework set forth by the Supreme Court in Anderson v. Celebrezze, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), and its progeny, we find that the combination of these two requirements imposes a severe burden on the constitutional rights of the LPO, its members, and its potential voter-supporters. As the regulations are not narrowly tailored and do not advance a compelling state interest, Ohio’s system for registering new political parties violates the Constitution. Thus, we reverse the ruling of the district court.
I.
This case presents a conflict between the constitutional rights of minor political parties and the authority of a state to regulate its elections and ensure the state’s relevance in the modern presidential election cycle. As the nominees of the “major” political parties[1] become known earlier in the election year, states have pushed back the dates of their primary elections to the beginning of the primary election cycle. Over the last twenty-five years, the primary date in Ohio in presidential election years has moved from the first Tuesday in June to the first Tuesday in March. Compare Ohio Rev.Code § 3501.01(E)(2) with Anderson, 460 U.S. at 783 n. 1, 103 S.Ct. 1564 (citing the code section in effect in 1980). As a result, the date by which a political party must file to qualify for the primary also has moved, from the end of March in the year of the election to the beginning of November in the preceding year. See Ohio Rev.Code § 3517.012. The issue in this case is whether the move to accommodate the major parties has placed an impermissible burden on the constitutional rights of minor parties, including the LPO, and the supporters of these minor parties.
The Ohio Constitution requires that all political parties, including minor parties, nominate their candidates at primary elections. Ohio Const. Art. V, § 7. By statute, primaries are held the first Tuesday after the first Monday in May, except in presidential election years, when the primaries are held the first Tuesday after the first Monday in March. Ohio Rev.Code § 3501.01(E)(l)-(2). The 2004 primaries were held on March 2 of that year.
Ohio law provides two methods by which a party can qualify for the primary election. Any party that, in the preceding state election, receives at least five percent *583 of the vote for its candidate for governor or president automatically qualifies for the next statewide election.[2] Ohio Rev.Code § 3517.01(A)(1). All other parties must file a petition no later than 120 days prior to the date of the primary election that contains the number of signatures equal to one percent of the total votes cast in the previous election — 32,290 in 2004. Id. A party that does not file a petition by this date cannot participate in the primary and is thus prevented from appearing on the general election ballot. To be on the ballot for the November 2, 2004 general election, minor parties like the LPO were required to submit a petition no later than November 3, 2003.
On October 30, 2003, the LPO filed a Petition to Form a Political Party, containing the requisite number of signatures, with the Secretary. In a letter dated November 24, 2003, the Secretary informed the party that the petition was invalid because it did not include the correct election falsification notice. The required notice had been changed by state statute in August 2001, but the LPO continued to use an older form, with the previous version of the notice.[3] When the Secretary rejected the petition, the LPO had no time to obtain signatures on the proper form in advance of the filing deadline. The LPO thus failed to qualify as a political party and was unable to participate in the March 2, 2004, primary election. As a result, the party and its candidates were prohibited from appearing on the ballot for the 2004 general election.
On January 6, 2004, the LPO filed suit under 42 U.S.C. § 1983, claiming a violation of the rights guaranteed under the First and Fourteenth Amendments and seeking declaratory and injunctive relief. On January 15,the LPO moved for a preliminary injunction that would (1) direct the state to accept the party’s petition, (2) invalidate the state’s early filing deadline so that the LPO could file a new petition, or (3) invalidate Ohio’s requirement that the LPO nominate its candidates by primary and permit it to nominate through party caucus or convention. On February 5, the district court denied the motion by reason of laches but did not rule on the constitutional claims. On June 1, the LPO and the State filed cross-motions for summary judgment. The court granted the State’s motion and denied the LPO’s motion. The LPO filed a timely appeal.[4] We review a district court’s grant of summary judgment de novo. Terry Barr Sales Agency, Inc. v. All-Lock Co., 96 F.3d 174, 178 (6th Cir.1996).
II.
Our first duty is to determine whether the completion of the election has deprived this court of jurisdiction. *584 Though neither party raises the issue of mootness, a federal court has a continuing duty to ensure that it adjudicates only genuine disputes between adverse parties, where the relief requested would have a real impact on the legal interests of those parties. See Church of Scientology v. United States, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992); McPherson v. Mich. High School Athletic Ass’n, 119 F.3d 453, 458 (6th Cir.1997) (en banc). If “the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome,” then the case is moot and the court has no jurisdiction. Los Angeles County v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). “The mootness inquiry must be made at every stage of a case; thus, if a case becomes moot during an appeal, the judgment below must be vacated and the case remanded with instructions to dismiss.” McPherson, 119 F.3d at 458.
An exception to the mootness doctrine exists for wrongs that are “capable of repetition, yet evading review.” See Rosen v. Brown, 970 F.2d 169, 173 (6th Cir.1992) (quoting Southern Pac. Terminal Co. v. ICC, 219 U.S. 498, 514, 31 S.Ct. 279, 55 L.Ed. 310 (1911)). This doctrine applies when (1) the challenged action is too short in duration to be fully litigated prior to its cessation or expiration and (2) there is a reasonable expectation or a demonstrated probability that the controversy will recur. See Honig v. Doe, 484 U.S. 305, 318-19 n. 6, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). The first prong of this test is easily satisfied. Legal disputes involving election laws almost always take more time to resolve than the election cycle permits. See Moore v. Ogilvie, 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); Lawrence v. Blackwell, 430 F.3d 368, 371 (6th Cir.2005). In the present case, less than eleven months elapsed between the filing of the lawsuit and the occurrence of the election, and future challenges will face the same problem.
Whether the issues in this case satisfy the second prong, however, is a more complex question that requires separating the two categories of claims brought by the LPO. The first challenges the Ohio requirement that election laws must be strictly complied with, unless the statute expressly states otherwise. See State ex rel. Vickers v. Summit County Council, 97 Ohio St.3d 204, 777 N.E.2d 830, 835 (Ohio 2002); State ex rel. Comm. for the Referendum of Lorain Ordinance, 96 Ohio St.3d 308, 774 N.E.2d 239, 249 (Ohio 2002); see also Ohio Rev.Code § 3517.011. This dispute arose because the election falsification notification contained on the LPO’s petition did not follow the exact wording required by Ohio law. The attempted justification for the LPO’s non-compliance, however, does not lead this court to reasonably expect that the LPO or other political parties will encounter this same injury in the future. In August 2001, the Ohio legislature changed the election falsification notice that is required on a political party petition form. The LPO alleges that it began distributing its petition form in April 2001, before the change took effect, and thus, its forms contained the old notification. When the LPO presented its petition in November 2003, it was rejected for containing the improper notice. Outside of this unique factual situation, there is not a reasonable expectation or demonstrated probability that the LPO or any other political group will be injured by Ohio’s requirement of strict compliance with election laws. The capable of repetition exception does not apply, and the issue of the constitutionality of the strict compliance standard is moot.
On the other hand, it is likely that the LPO will once again seek to place *585 candidates on the general election ballot in 2008. As a result, the party again will face the requirements that its candidates be selected in a March primary and that it file a petition for party recognition 120 days in advance of this primary. Considering the “somewhat relaxed” repetition standard employed in election cases, see Lawrence, 430 F.3d at 372, this issue easily satisfies the “capable of repetition, yet evading review” exception and is not moot. See also Norman v. Reed, 502 U.S. 279, 287-88, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992).
III.
We therefore turn to the merits of the second issue — whether the combined effect of the Ohio election laws being challenged impermissibly burdens the plaintiffs’ rights to free speech and association under the First Amendment.[5] When analyzing the statutes, we are cognizant that “the state laws place burdens on two different, although overlapping, kinds of rights — the right of individuals to associate for the advancement of political beliefs and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.” Williams v. Rhodes, 393 U.S. 23, 30, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); see also Anderson v. Celebrezze, 460 U.S. 780, 786, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983) (“[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical correlative effect on voters.”) (quoting Bullock v. Carter, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972)). The right to cast an effective vote “is of the most fundamental significance under our constitutional structure.” Burdick v. Takushi, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). The rights of political association and free speech occupy a similarly hallowed place in the constitutional pantheon. See California Democratic Party v. Jones, 530 U.S. 567, 574, 120 S.Ct. 2402, 147 L.Ed.2d 502 (2000) (“Representative democracy in any populous unit of governance is unimaginable without the ability of citizens to band together in promoting among the electorate candidates who espouse their political views.”).
This does not mean, however, that all state restrictions on political parties and elections violate the Constitution. The Supreme Court has clearly stated that states “may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.” Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997); see also Storer v. Brown, 415 U.S. 724, 730, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). Thus, voting regulations are not automatically subjected to heightened scrutiny. The Supreme Court has set forth the appropriate analytical framework in Anderson, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547, and Burdick, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245. First, the court looks at the “character and magnitude of the asserted injury” to petitioner’s constitutional rights. Anderson, 460 U.S. at 789, 103 S.Ct. 1564. The court must then “identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule.” Id. If petitioner’s rights are subjected to “severe” restrictions, “the regulation must be ‘narrowly drawn to advance a state interest of compelling importance.’ ” Burdick, 504 U.S. at 434, 112 S.Ct. 2059 (quoting Norman v. Reed, 502 U.S. 279, *586 289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992)). But if the state law imposes only “reasonable, nondiscriminatory restrictions” upon the protected rights, then the interests of the state in regulating elections is “generally sufficient to justify” the restrictions. Id. (quoting Anderson, 460 U.S. at 788, 103 5.Ct. 1564).[6]
A.
The first step under the Anderson/Burdick framework[7] is to determine whether this burden on the associational rights of political parties is “severe.” In order to accurately apply this test, we must first determine the exact nature of the burden placed upon minor political parties and their voter-supporters. The LPO challenges the Ohio regulations that: (1) mandate that parties not meeting the five percent vote threshold in the previous election file a petition 120 days in advance of the primary election in order to qualify; and (2) require that parties participate in the March primary in order to appear on the general election ballot. Our inquiry is not whether each law individually creates an impermissible burden but rather whether the combined effect of the applicable election regulations creates an unconstitutional burden on First Amendment rights. See Williams, 393 U.S. at 34, 89 S.Ct. 5.
Many courts have documented the burden imposed by statutes requiring political parties to file registration petitions far in advance of the primary and general elections. See, e.g., Council of Alternative Political Parties v. Hooks, 121 F.3d 876, 880 (3d Cir.1997) (“Hooks I") (noting that an April deadline' — 60 days in advance of the primary — required minor parties to rally support “when the election is remote and voters are generally uninterested in the campaign”); Citizens to Establish a Reform Party of Ark. v. Priest, 970 F.Supp. 690, 697-98 (E.D.Ark.1996) (concluding that a January deadline prevented minor parties from finding volunteers, attracting media coverage and recruiting supporters, all of which impacted its ability to appear on the ballot); McLain v. Meier, 637 F.2d 1159, 1163-64 (8th Cir.1980) (“McLain I”) (same — June deadline 90 days in advance of primary). Deadlines early in the election cycle require minor political parties to recruit supporters at a time when the major party candidates are not known and when the populace is not politically energized. In this case, the LPO needed to find more than thirty thousand Ohio residents to sign its petition to appear on the 2004 ballot more than one year in advance of the election.[8] Early deadlines also have the effect of ensuring that any contentious issue raised in the same year as an election cannot be responded to by the formation of a new political party. The combination of these burdens impacts the party’s ability to appear on the general election ballot, and thus, its opportunity to garner votes and win the right to govern. The LPO’s *587 argument, thus, is that the ballot-access restrictions resulting from the filing deadline one year in advance of the general election imposes a severe burden on the First Amendment rights of the party, its members, and its potential voter-supporters.
1.
The role of this court is not to impose our own idea of democracy upon the Ohio state legislature; rather, we must limit our analysis to whether the restrictions imposed on the registration of minor political parties fits within the outer limits of what the First Amendment requires. At the same time, we realize that the State may not be a “wholly independent or neutral arbiter” as it is controlled by the political parties in power, “which presumably have an incentive to shape the rules of the electoral game to their own benefit.” Clingman v. Beaver, 544 U.S. 581, 125 S.Ct. 2029, 2044, 161 L.Ed.2d 920 (2005) (O’Conner, J., concurring). Thus, though the court’s role in reviewing election regulations is limited, it is also vital in that it protects interests that may not be adequately represented in the political process.
In determining the magnitude of the burden imposed by a state’s election laws, the Supreme Court has looked to the associational rights at issue, including whether alternative means are available to exercise those rights; the effect of the regulations on the voters, the parties and the candidates; evidence of the real impact the restriction has on the process; and the interests of the state relative to the scope of the election.
The key factor in determining the level of scrutiny to apply is the importance of the associational right burdened. Restrictions that do not affect a political party’s ability to perform its primary functions — organizing and developing, recruiting supporters, choosing a candidate, and voting for that candidate in a general election' — have not been held to impose a severe burden. For example, the Supreme Court upheld Minnesota’s “anti-fusion” law, which prohibits an individual from appearing on the ballot as the candidate for more than one party. Timmons, 520 U.S. at 354, 117 S.Ct. 1364. In refusing to apply strict scrutiny, the Court noted that the law did “not restrict the ability of the [party] and its members to endorse, support, or vote for anyone they like,” id. at 363, 117 S.Ct. 1364, nor did it “exclude[ ] a particular group of citizens, or a political party, from participation in the election process.” Id. at 361, 117 S.Ct. 1364. The Court emphasized that the party was still “able to use the ballot to communicate information about itself and its candidates to the voters, so long as that candidate is not already someone else’s candidate.” Id. at 363, 117 S.Ct. 1364. As a result, any burden imposed was minimal and justified by the important state interest in avoiding voter confusion and minimizing problems with the election process. Id. at 363-64, 117 S.Ct. 1364. See also Burdick, 504 U.S. at 436-37, 112 S.Ct. 2059 (refusing to apply strict scrutiny to Hawaii’s statute prohibiting write-in votes because the many different routes for gaining access to the ballot in the state made the burden a “very limited one”). The Court recently followed Tim-mons in upholding an Oklahoma statute that allows only registered members of the party and registered independents to vote in a primary election. Clingman, 125 S.Ct. at 2039. Again noting that the statute in no way limited a political party’s access to the ballot or to choose and vote for its own candidate, the Court held that such “minor barriers between voter and party do not compel strict scrutiny.” Id.; *588 see also Schrader v. Blackwell, 241 F.3d 783, 790-91 (6th Cir.2001) (upholding a law that prevents independent candidates from being associated with a political party on the ballot if the party has not qualified under state law).
As noted above, however, the statutes at issue in this case do not merely affect the rights of the LPO to associate with nonmembers or select a certain candidate to be its standard-bearer. Certainly, both of these interests are implicated, but Ohio’s regulations limit a far more important function of a political party — its ability to appear on the general election ballot. In cases analyzing restrictions on ballot access, the Supreme Court
focus[es] on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity.
Anderson, 460 U.S. at 793, 103 S.Ct. 1564 (quoting Clements v. Fashing, 457 U.S. 957, 964, 102 S.Ct. 2836, 73 L.Ed.2d 508 (1982) (plurality opinion) (internal quotation marks and other citations omitted)). The Court has consistently noted the fundamental interest of citizens to create and develop new political parties. “To the degree that a State would thwart this interest by limiting the access of new parties to the ballot, [the Court has] called for the demonstration of a corresponding interest sufficiently weighty to justify the limitation ....” Norman, 502 U.S. at 288-89, 112 S.Ct. 698 (internal citation omitted). “[I]t is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group.” Anderson, 460 U.S. at 793, 103 S.Ct. 1564. The Court thus has applied strict scrutiny in striking down laws that required an independent candidate for President to register in March, seventy-five days before a June primary, to appear on the November ballot, id. at 806, 103 S.Ct. 1564, and a law that imposed a burdensome signature requirement on a party wishing to appear on the ballot in a local election, Norman, 502 U.S. at 294, 112 S.Ct. 698.
The ability of a political party to appear on the general election ballot affects not only the party’s rights, but also the First Amendment rights of voters. See Tashjian v. Republican Party of Conn., 479 U.S. 208, 214, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986) (noting the fundamental importance of “[t]he right to associate with the political party of one’s choice”). It is true that a voter does not have an absolute right to vote for a candidate of her choice, especially when that candidate or party has not complied with reasonable state regulations. See, e.g., Burdick, 504 U.S. at 441-42, 112 S.Ct. 2059 (upholding prohibition on write-in votes due largely to the ease of gaining access to the state’s ballot); Timmons, 520 U.S. at 354, 117 S.Ct. 1364 (limiting a candidate to representation of one political party); Schrader, 241 F.3d at 786. However, when a candidate wishes to appear as one party’s standard-bearer and voters want to exercise their constitutional right to cast a ballot for this candidate, the Court has viewed state-imposed restrictions on this fundamental process with great skepticism.
A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment. It discriminates against those candidates' — and of particular importance — against those voters whose political preferences lie outside the existing political parties.
Anderson, 460 U.S. at 793-94, 103 S.Ct. 1564. While a voter is not guaranteed that *589 one of the political parties will reflect his or her values, “the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot.” Williams, 398 U.S. at 31, 89 S.Ct. 5; see also Anderson, 460 U.S. at 787, 103 S.Ct. 1564. “In short, the primary values protected by the First Amendment ... are served when election campaigns are not monopolized by the existing political parties.” Anderson, 460 U.S. at 794, 103 S.Ct. 1564.
The evidence in the record shows that in Ohio, elections have indeed been monopolized by two parties, and thus, the burdens imposed by the state’s election laws are “far from remote.” Jones, 530 U.S. at 578, 120 S.Ct. 2402. In Jones, the Supreme Court noted the importance of evidence that the burden imposed was a “clear and present danger” and not merely the product of speculation. Id. The LPO has put forth evidence showing that Ohio is among the most restrictive, if not the most restrictive, state in granting minor parties access to the ballot. Of the eight most populous states, Ohio has had by far the fewest minor political parties on its general election ballot. From 1992-2002, the other states in this group averaged four minor political parties on the ballot each year. J.A. 58. In contrast, Ohio averaged one per year, and no minor political parties qualified for the ballot, in any race, in 1992, 1994, 2002 and 2004. This is a product of not only the primary requirement and filing deadline, but also of the laws providing for automatic party qualification.
In addition, of the seven states that require all political parties to nominate their candidates in the state’s primary election, Ohio imposes the most burdensome restrictions of both automatic qualification and petition qualification; as a result, it has seen the fewest number of minor parties on the ballot. California is the only other state with a filing deadline more than a year before the general election; however, its qualification requirements are much lower than Ohio’s, and the state had seven political parties automatically qualify for the ballot in 2004.[9] See Declaration of Richard Winger, App. F, J.A. 81-83. The same is true of Mississippi, which has a January filing deadline, but requires only that a party certify a list of statewide party officers in each of the state’s four congressional districts in order to qualify. It, too, had seven ballot-eligible political parties in 2004.[10] Id. Ohio had no minor political parties on its 2004 ballot. Id. at 3, J.A. 58. Forty-three other states, including Texas, New York, Illinois and Pennsylvania, permit minor political parties to nominate their candidates via convention or petition and provide far more flexibility in the date by which a party must qualify. Id. at App. F, J.A. 81-83. While not conclusive in and of itself, the Supreme Court has noted that a historical *590 record of parties and candidates being unable to meet the state’s ballot-access requirements is a helpful guide in determining their constitutionality. Stover, 415 U.S. at 742, 94 S.Ct. 1274; see also Jones, 530 U.S. at 578, 120 S.Ct. 2402.
Put simply, the restrictions at issue in this case serve to prevent a minor political party from engaging in the most fundamental of political activities — recruiting supporters, selecting a candidate, and placing that candidate on the general election ballot in hopes of winning votes and ultimately, the right to govern. The evidence in the record indicates the negative impact these laws have had on minor parties and on political activity as a whole in Ohio. As such, we find that the Ohio system for registering minor political parties imposes a severe burden on associational rights.
In so ruling, we follow the great weight of authority that has distinguished between filing deadlines well in advance of the primary and general elections and deadlines falling closer to the dates of those elections. Our court has recently noted this distinction in upholding an Ohio statute requiring an independent candidate to file a registration petition the day before the state’s primary election. Lawrence, 430 F.3d at 375. The court in that case explicitly distinguished cases in which courts had found that deadlines far in advance of the primary election imposed a severe burden on the rights of political parties, candidates, and voters. See id. at 374 n. 2. Two district courts within this circuit have also utilized strict scrutiny in striking down early filing deadlines. See Libertarian Party of Ky. v. Ehrler, 776 F.Supp. 1200, 1205-06 (E.D.Ky.1991) (January deadline, 119 days before the primary); Cripps v. Seneca County Bd. of Elections, 629 F.Supp. 1335, 1338 (N.D.Ohio 1985) (February deadline for independent candidates, 75 days before the primary).
Our sister circuits have also found filing deadlines well in advance of the election date to be unconstitutional because of the restrictions such laws place on the ability of the party or candidate to appear on the ballot. In examining Alabama’s April deadline for minor parties, the Eleventh Circuit ruled that the burden imposed was not “insurmountable” but that “[n]o one can seriously contend that a deadline for filing for a minor party and its candidates seven months prior to the [general] election is required to advance legitimate state interests.” New Alliance Party of Ala. v. Hand, 933 F.2d 1568, 1576 (11th Cir.1991). The law in that case required filing a petition 60 days in advance of the primary election. Id. at 1571. The Eighth Circuit has encountered this issue on at least three occasions, striking down Nebraska’s February deadline, which was 90 days ahead of the primary, MacBride v. Exon, 558 F.2d 443, 449 (8th Cir.1977), and North Dakota’s June deadline, which was 90 days before the primary, McLain I, 637 F.2d at 1164. When later faced with the amended North Dakota law, the court upheld the state’s April deadline on the basis that it was only 55 days ahead of the primary and the state had significantly reduced the signature requirement to 7,000. McLain v. Meier, 851 F.2d 1045, 1050-51 (8th Cir.1988). The Third Circuit faced a similar situation, striking down New Jersey’s April deadline, which was 54 days before the primary, Hooks I, 121 F.3d at 883, but upholding the amended statute that imposed a June deadline, one day in advance of the state’s primary, Council of Alt. Political Parties v. Hooks, 179 F.3d 64, 77-78 (3d Cir.1999).
A number of other courts have noted the problems associated with filing deadlines far in advance of the election. In evaluat *591 ing Arkansas’s January deadline, one district court noted that “[e]arly filing deadlines ... unduly hinder, if not bar, minor political parties from influencing the electoral process by ballot access. Only in the election year itself do issues begin to coalesce such that minority parties with opposing or different views may emerge.” Priest, 970 F.Supp. at 698. The court thus analyzed the law under strict scrutiny and found it unconstitutional. Id. The court in Stoddard v. Quinn followed the same logic in finding that Maine’s April 1 deadline, more than two months ahead of the primary election, imposed an unconstitutional burden on the parties’ First Amendment rights. 593 F.Supp. 300, 304-05 (D.Me.1984). On the other hand, both the Fourth and Fifth Circuits have upheld laws that required parties to file registration petitions only the day before the state’s May primary election. Fishbeck v. Hechler, 85 F.3d 162, 165 (4th Cir.1996); Tex. Indep. Party v. Kirk, 84 F.3d 178, 185 n. 4 (5th Cir.1996) (distinguishing a deadline to declare an intention to run in January from the actual filing deadline in May). See also Rainbow Coal. of Okla. v. Okla. State Election Bd., 844 F.2d 740, 747 (10th Cir.1988) (upholding May 31 deadline, 55 days in advance of primary election).
We find both the reasoning and the conclusions of these courts to be compelling. Ohio’s deadline in the November preceding the election is the earliest of any deadline reviewed by a federal court. It is 120 days in advance of the primary election and 364 days ahead of the general election for which the party wishes to appear on the ballot. This deadline imposes a severe burden on the First Amendment rights of the LPO.[11]
2.
The State makes several arguments that the burdens imposed by the regulations are not severe.
The first contention is that the laws place no limit on key First Amendment rights of recruiting new members and engaging in political speech. We find this argument unpersuasive. First, the laws in question may indeed place limits on these other associational rights. The requirement that a fledgling political party rally support more than a year in advance of an election, when the major party candidates are not known and the majority of the country is not focused on the election, is an exceedingly difficult task. This easily could mute the party’s message and limit its ability to recruit new members. See Priest, 970 F.Supp. at 697-98. Even if the statutes leave some associational rights unimpeded, this is not sufficient to establish that no burden is imposed. The Supreme Court has noted that a statute affecting key First Amendment rights does not become less burdensome because it does not limit all associational rights. See Jones, 530 U.S. at 581, 120 S.Ct. 2402 (“We have consistently refused to overlook an unconstitutional restriction upon some First Amendment activity simply because it leaves other First Amendment activity unimpaired.”).
Moreover, the rights left unimpeded by the Ohio regulations are not the ones most central to the goals of a political party. Recruiting members and engaging in polit *592 ical speech are important rights, but a political party’s aims are far higher. The LPO does not aspire simply to assemble in public meeting places and engage in speech activities that further their beliefs. Certainly, this is a cherished First Amendment right and one that is jealously guarded. But the goal of a political party and its supporters is to govern. See Schrader, 241 F.3d at 789 (“A new party organization contemplates a statewide, ongoing organization with distinctive political character. Its goal is typically to gain control of the machinery of state government by electing its candidates to public office.”) (quoting Storer, 415 U.S. at 745, 94 S.Ct. 1274). A party cannot lead if not elected and cannot be elected if not on the ballot. As the Supreme Court stated thirty years ago, “[t]he right to form a party for the advancement of political goals means little if a party can be kept off the election ballot ....” Williams, 393 U.S. at 31, 89 S.Ct. 5. The statutes at issue in this case affect the ability of a political party to appear on the ballot and thus to exercise its most fundamental of rights.
Next, the State notes that Ohio law permits a candidate of a minor political party to appear on the ballot without participating in the primary election. To do so, a candidate need only file a nominating petition 75 days prior to the general election (August 18 in 2004), and he or she will be listed without party affiliation — as an independent or under “Other Party.” See Ohio Rev.Code § 3513.257; Anderson, 460 U.S. 806, 103 S.Ct. 1564 (striking down the previous law setting the deadline as 75 days before that year’s primary election). This argument also misses the mark. Political parties, especially for national elections, aim to gather members together under a common title and common ideological beliefs. On many ballots, the option of a “straight-ticket” vote is even available, which allows an individual to mark one box that automatically selects the candidates from one of the major parties. Thus, in many cases party affiliation has the same, if not more, importance than the identity of the candidate. The Supreme Court has noted that “the political party and the independent candidate approaches to political activity are entirely different and neither is a satisfactory substitute for the other.” Storer, 415 U.S. at 745, 94 S.Ct. 1274. A candidate’s appearance without party affiliation is not a substitute for appearing under a party name, and it does not lessen the burden imposed by Ohio’s restrictions on minor parties.
The State’s final argument is that the LPO filed its petition ahead of the deadline, only to have it rejected on procedural grounds. The fact that the LPO could comply with all of the requirements, and had done so in the past, the State contends, is evidence that the burden imposed is not severe. We find this argument equally unpersuasive. First, it ignores the fact that the early deadline prevented the party from re-filing a petition on the correct form, because the deadline had passed. Moreover, the fact that an election procedure can be met does not mean the burden imposed is not severe. See Anderson, 460 U.S. at 791 n. 12, 103 S.Ct. 1564. A party is not required to intentionally forfeit its place in the political arena in order to challenge an election law.
We make one additional observation about the State’s arguments. The State analyzes the burdens imposed by the challenged statutes separately, rather than addressing their collective impact. For example, it argues that Jones, 530 U.S. at 572, 120 S.Ct. 2402, is controlling on the question of whether states may require political parties to nominate their candidates in a primary election. Putting aside the issue of whether Jones actually stands for this proposition, such reliance misses *593 the point. The LPO does not challenge the primary requirement alone, but rather in combination with the 120-day filing deadline. It is this combined burden on the party’s rights that we must address.
The State has not convinced us that the burden imposed by the filing deadline and primary requirement is not severe. There are few greater burdens that can be placed on a political party than being denied access to the ballot. In this ease, the combination of the laws challenged by the LPO acted to impose just such a burden. We hold that the combination of Ohio laws that require a political party to file a registration petition twelve months in advance of the general election in order to appear on the ballot imposes a severe burden on the First Amendment rights of the LPO and its potential voter-supporters. As such, any regulation of this right “must be narrowly drawn to advance a state interest of compelling importance.” Burdick, 504 U.S. at 434, 112 S.Ct. 2059.
B.
The State has made no clear argument regarding the precise interests it feels are protected by the regulations at issue in the case, relying instead on generalized and hypothetical interests identified in other cases. Reliance on suppositions and speculative interests is not sufficient to justify a severe burden on First Amendment rights. See Reform Party of Allegheny County v. Allegheny County Dep’t of Elections, 174 F.3d 305, 315-16 (3d Cir.1999) (citing Anderson, 460 U.S. at 789, 103 S.Ct. 1564); cf. Edenfield v. Fane, 507 U.S. 761, 768, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) (ruling that courts cannot “supplant the precise interests put forward by the State with other suppositions” in evaluating restrictions on commercial speech under the Central Hudson test). In the interest of a full and fair review, however, we have mined the State’s brief and argument to identify its proffered rationales for the primary requirement and filing deadline. To determine if these interests are compelling, we examine each “in the circumstances of this case.” Jones, 530 U.S. at 584, 120 S.Ct. 2402 (emphasis omitted).
The State argues that a filing deadline 120 days in advance of the primary election allows a reasonable amount of time to process a petition for the registration of a political party. In that 120 days, the State must certify the signatures on the petition; allow for administrative appeals; print, distribute, and proof ballots; and prepare and mail absentee ballots. It is true that a 120-day period may be a reasonable amount of time to process the registration of a political party; however, this is not the inquiry before us.[12] Rather, we must examine whether mandating that this 120-day period take place in advance of a March primary, resulting in a filing deadline one year in advance of the general election, promotes a compelling state interest. We find it does not.
The primary interests asserted by the State include preserving the integrity and fairness of the electoral process and ensuring that minor parties given access to the ballot have established bona fide support. Both the Supreme Court and this court have recognized the viability of these interests, see Timmons, 520 U.S. at 363-64, 117 S.Ct. 1364; Lawrence, 430 F.3d at 375, *594 but the State has provided no evidence that its registration procedure for minor parties in any way protects these interests. The State makes no argument that a filing deadline one year in advance of the general election is needed to ensure electoral fairness, and it would be difficult to do so. Forty-eight states have filing deadlines for minor parties later in the election cycle, and forty-three states allow minor parties to nominate candidates in a manner other than the primary election.
The State also asserts an interest in regulating the number of candidates in order to promote political stability, encourage compromise that limits the number of candidates with short-range goals, and avoid voter confusion. Again, the State has put forth no evidence that these interests are compelling or that they are advanced by the early filing deadline. There is some question as to whether this rationale is even reasonable. A state may not legitimately claim that preventing other parties from accessing the ballot is needed to protect political stability. The deadline in this case serves only to prevent the registration of new political parties unless those parties can mobilize more than a year before the election in which they wish to run. This system serves to protect the two major parties at the expense of political dialogue and free expression, which is not justified, much less compelling. See Anderson, 460 U.S. at 804, 103 S.Ct. 1564; Williams, 393 U.S. at 31-32, 89 S.Ct. 5.
Moreover, the regulations arguably have a negative effect on limiting short-range candidates and preventing voter confusion. Political parties are organizations with short and long-term political objectives, as well as a desire for continuity and growth. By making it more difficult for parties to access the political arena, the state actually increases the possibility that issue-specific independent candidates will emerge to fill this void.[13] These candidates do not offer the stability of a political party, and the sheer number leads to a greater likelihood of political instability and voter confusion. The State has made no showing that the voters of Ohio, who are able to cast an effective ballot featuring several independent candidates, would be flummoxed by a ballot featuring multiple political parties.
Finally, it is important to note that the state’s interests in regulating an election cannot trump the national interest in having presidential candidates appear on the ballot in each state. In the context of the presidential election, “state-imposed restrictions implicate a uniquely important national interest.” Anderson, 460 U.S. at 794-95, 103 S.Ct. 1564 (footnote omitted). Strict ballot access requirements imposed by states have an impact beyond their own borders, placing some limits on a state’s prerogative to regulate its elections. Moreover, as opposed to state or local elections, the outcome of a presidential election largely will be determined by voters outside a state’s borders, reducing the importance of the state’s administrative concerns. The combination of restrictions in this case “does more than burden the associational rights of ... voters and candidates. It places a significant state-imposed restriction on a nationwide electoral process.” Anderson, 460 U.S. at 795, 103 S.Ct. 1564.
*595 Moving the filing deadline closer to the date of the primary or allowing parties to choose their candidates in another manner may impose some additional costs on the state, but this is the price imposed by the First Amendment. Ohio is well within its authority to mandate primary elections, to limit all parties to one primary date, or to require filing a petition in advance of the primary for administrative purposes. Viewed individually, each of these requirements may only impose a reasonable burden on constitutional rights. In practice, however, the combination of these laws imposes a severe burden on the associational rights of the LPO, its members, and its potential voter-supporters. As the State has not shown that these laws are narrowly tailored to protect a compelling state interest, we find that the Ohio system for minor party qualification violates the First Amendment of the Constitution.
IV.
There is an inherent constitutional tension between the rights of states to conduct and regulate elections and the rights of political parties and voters to exercise their First Amendment rights. We do not presume to dictate how Ohio must run its elections, except to say that the system must fall within the outer boundaries established by the Constitution. The filing deadline and primary requirement challenged by the LPO, when viewed in combination, fall outside these constitutional limits.
For these reasons, we reverse the judgment of the district court.

. Throughout this opinion, the Republican and Democratic parties will be referred to as the "major” political parties. All other political parties will be known as "minor” political parties. Judge Griffin correctly notes that the language of Ohio Rev.Code § 3517.01 makes no distinction between "major” and "minor” political parties. However, as will be discussed in Part III.A.l, the practical effect of the state's election law has been to limit the rights of parties other than the Republican and Democratic Parties from appearing on the general election ballot, making them the de facto "major” parties.

. In Ohio, the election for governor occurs in even-numbered years in which there is no presidential election.

. The notice currently required by Ohio law reads: “Whoever commits election falsification is guilty of a felony of the fifth degree.” Ohio Rev.Code § 3501.38(J). The form used by petitioner contained the notice required prior to August 2001: "The penalty for election falsification is imprisonment for not more than six months, or a fine of not more than one thousand dollars.”

.The LPO also appealed the district court's denial of its post-judgment motion seeking to rectify its earlier failure to file a motion for summary judgment as a separate document. In denying the motion, the district court noted that it had already construed the LPO’s memorandum in support of summary judgment as a motion for summary judgment and had addressed the merits of the motion. In any event, the LPO has not mentioned the order denying the post-judgment motion in its brief and thus has abandoned its appeal from it.

. Judge Griffin's opinion criticizes the "somewhat relaxed” repetition standard used in election cases. The standard, as noted above, is the law of this circuit.

. Following the analytical framework set forth by the Supreme Court, "we base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis. We rely, however, on a number of [the Court's] prior election cases relying on the Equal Protection Clause of the Fourteenth Amendment.” Norman, 502 U.S. at 288 n. 8, 112 S.Ct. 698 (quoting Anderson, 460 U.S. at 786-87 n. 7, 103 S.Ct. 1564).

. The analytical approach we undertake is identical to that employed in Lawrence, 430 F.3d at 372. The restriction in Lawrence, a requirement that independent candidates file the day before the primary, did not impose a severe burden. Therefore, the Lawrence court correctly did not apply strict scrutiny. There is no tension between this case and Lawrence.

. The fact that the LPO met this requirement does not affect our analysis. See infra Part III.A.2.

. California's primary in 2004 was also on March 2, and its filing deadline was 135 days in advance (end of October 2003). California, though, makes it far easier for minor parties to qualify. The party must poll 2% in any statewide race in a gubernatorial election year, and no vote test applies in presidential years. The party must also keep its registration membership above one-fifteenth (1/15) of one percent (1%) of the state total. J.A. 83.
In contrast, only one minor party has automatically qualified under Ohio law — the Reform Party, with Ross Perot as its candidate, in 1996. Running as independent candidates, Perot in 1992 and John B. Anderson in 1980 also surpassed the five percent threshold. See "Election Results,” Ohio Secretary of State, at http://www.sos.state.oh.us/sos/ElectionsVo-ter/electionResults.aspx (last visited March 20, 2006).

. Only four other states require minor political parties to nominate their candidates in a primary election; all four have filing deadlines in April or later. J.A. 83-84.

. In non-presidential election years, primaries are held the first week in May, and thus the filing deadline is in January, ten months in advance. Ohio Rev.Code § 3501.01(E)(1)-(2). This deadline is 120 days in advance of the primary and still ten months ahead of the general election. This case, however, involves a challenge only to the laws’ application in a presidential election year. We make no ruling on the laws' application in non-presidential election years.

. Though we need not rule on this issue, the great weight of authority from other circuits indicates that a filing deadline 120 days in advance of the primary may fall short of being even a reasonable state interest. See supra Part III.A.l (discussing cases from other courts).

. In the 2004 election, the Ohio ballot contained thirteen independent candidates. In 2002, eleven independent candidates were on the state ballot. These numbers are totals from the presidential, gubernatorial, congressional and state legislative races. They do not include write-in candidates, of which there were many. See "Official Election Results," Ohio Secretary of State, at http://www.sos.state.oh.us/sos/ElectionsVo-ter/electionResults.aspx (last visited March 20, 2006).