RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 14a0201p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――

GREEN PARTY OF TENNESSEE; CONSTITUTION PARTY
OF TENNESSEE,

*Plaintiffs-Appellees*,

*v.*

TRE HARGETT, in his official capacity as Tennessee
Secretary of State; MARK GOINS, in his official
capacity as Coordinator of Elections for the State of
Tennessee,

*Defendants-Appellants*.

Nos. 13-5975/6280

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:11-cv-00692—William J. Haynes, Jr., District Judge.

Argued: August 7, 2014

Decided and Filed: August 22, 2014

Before: COLE, Chief Judge; COOK and WHITE, Circuit Judges.

―――――――――――

**COUNSEL**

**ARGUED:** Janet M. Kleinfelter, OFFICE OF THE TENNESSEE ATTORNEY GENERAL,
Nashville, Tennessee, for Appellants. Alan P. Woodruff, Gray, Tennessee, for Appellees. **ON
BRIEF:** Janet M. Kleinfelter, OFFICE OF THE TENNESSEE ATTORNEY GENERAL,
Nashville, Tennessee, for Appellants. Alan P. Woodruff, Gray, Tennessee, for Appellees.

————————

**OPINION**

————————

COLE, Chief Judge.    The Green Party of Tennessee and the Constitution Party of Tennessee seek to appear on Tennessee's general election ballots as minor political parties.    In February 2011, they filed suit under 42 U.S.C. § 1983 against Tennessee state officials to challenge laws that they claim have unconstitutionally impeded their access to the ballot.    One year later, the district court granted summary judgment to the plaintiffs; the defendants then appealed, and this court reversed and remanded, in part because Tennessee had amended the statutes at issue.    On remand, both parties filed cross-motions for summary judgment, and the district court again granted the plaintiffs' motion.    Defendants again appeal.

This appeal presents four questions: (1) whether the plaintiffs have standing to challenge Tennessee's election laws, (2) whether the state's ballot-access scheme for minor political parties unconstitutionally burdens the plaintiffs' First Amendment rights, (3) whether the state's preferential ballot-ordering statute impermissibly discriminates against minor political parties in violation of the First and Fourteenth Amendments, and (4) whether the district court properly awarded attorney's fees to the plaintiffs.    We conclude that the plaintiffs do have standing, but we reverse and remand the district court's order granting summary judgment to the plaintiffs on their ballot-access and ballot-ordering claims.    We further conclude that the plaintiffs are a prevailing party entitled to attorney's fees, but we vacate the district court's fee award and remand for recalculation.

**I.  BACKGROUND**

This case centers on two sets of Tennessee statutes, the first regarding when a political party's name may appear alongside its chosen candidates on the state's general-election ballot, and the second regarding the order in which parties' and candidates' names appear on the ballot. The plaintiffs, minor political parties active in Tennessee, allege that they consistently have been denied access to Tennessee's ballot due to the state's unduly strict requirements.    To be clear, this case does not involve Tennessee's rules regarding when a particular *candidate* may appear

on the ballot; it involves only the requirements a political *party* must meet. In fact, under Tennessee law, a candidate with no party affiliation can very easily qualify to appear on the ballot upon submitting a petition signed by as few as twenty-five registered, eligible voters. *See* Tenn. Code Ann. § 2-5-101(b).

The full history of this litigation is addressed in a prior opinion from this court, as well as two district court opinions. *See Green Party of Tenn. v. Hargett*, 882 F. Supp. 2d 959 (M.D. Tenn. 2012) (*Green Party I*), *rev'd*, 700 F.3d 816 (6th Cir. 2012) (*Green Party*), *remanded to* 953 F. Supp. 2d 816 (M.D. Tenn. 2013) (*Green Party II*). The facts relevant to this appeal are provided below.

## A.  Tennessee's Ballot-Access and Ballot-Ordering Provisions

Since the early 1960s, Tennessee has imposed certain requirements on organizations seeking to be recognized as political parties on the state's ballots. *See Libertarian Party of Tenn. v. Goins*, 793 F. Supp. 2d 1064, 1069–70 (M.D. Tenn. 2010) (summarizing history of ballot-access scheme). The plaintiffs argue that these requirements effectively bar them from appearing on Tennessee's general-election ballot, in violation of their First Amendment rights to expression and political association. In support, they note that the only minor political party since 1961 to have qualified for ballot access via petition was George Wallace's American Independent Party, which qualified in 1968 and 1972. *See Green Party I*, 882 F. Supp. 2d at 969.

In 2011, when the plaintiffs filed their complaint in this case, political parties could qualify to appear on the ballot in one of two ways. First, if, in the past four years, at least one of a party's candidates running for state office had received a number of votes equal to or greater than 5% of the total votes cast in the previous gubernatorial election, that party would be designated a "statewide political party" and as such would automatically qualify for inclusion on the next general election ballot. *See* Tenn. Code Ann. § 2-1-104(a)(31) (2011). Second, a party that did not meet this 5%-vote threshold could seek inclusion—as a so-called "recognized minor party"—by submitting a petition signed by a number of registered voters equal to or greater than 2.5% of the total vote cast in the previous gubernatorial election. *See id*. § 2-1-104(a)(24) (2011). This petition was due in April, 119 days before Tennessee's primary election held in early August. *See id*. §§ 2-13-107(a) (2011) (amended 2012, 2014), 2-5-101(a)(1) (2011).

Furthermore, when this litigation began, participation in Tennessee's primary election was mandatory for certain offices. *See id.* §§ 2-13-202 (2011) (amended 2012), 2-13-203 (2011) (amended 2012). As addressed below, these requirements have since changed—which is in large measure why we now take a second pass at the plaintiffs' claims.

The plaintiffs also challenge a statute requiring that political parties appear on Tennessee's general-election ballots "in the following order: majority party, minority party, and recognized minor party, if any," with the names of any independent candidates listed last. *Id.* § 2-5-208(d)(1) (2011) (hereinafter the "ballot-ordering" provision). The plaintiffs argue that this provision, which has remained unchanged during this litigation, unconstitutionally discriminates against minor parties by conferring an advantage on the Republican and Democratic Parties.

**B. The History of This Case**

*1. Initial Proceedings in the District Court*

The plaintiff political parties filed this lawsuit in July 2011, challenging the ballot-access and ballot-ordering provisions described above as well as an additional statute not relevant here. As the plaintiffs' attorney acknowledged at oral argument for the instant appeal, the complaint attacked Tennessee's election statutes on the basis that they were facially invalid. As discovery proceeded, both the plaintiffs and the defendants submitted reports from election-law experts regarding the effects of Tennessee's ballot-access scheme on minor parties; the defendants also filed affidavits from state election officials explaining why, in their view, the 119-day petition-filing deadline was necessary to prepare ballots for the state's August primary elections.

The plaintiffs moved for summary judgment, which the district court granted as to all of their claims. The court held unconstitutional Tennessee's 2.5% petition-signature requirement and 119-day filing deadline, both standing alone and in combination, and also invalidated Tennessee's ballot-ordering provision. *Green Party I*, 882 F. Supp. 2d at 1008–09, 1013–14, 1016. In regard to the ballot-access scheme, the district court concluded that the parties' use of expert testimony and empirical data had "convert[ed] [the p]laintiffs' challenge into . . . an 'as applied' challenge." *Id.* at 1007. The court enjoined Tennessee from enforcing the offending

statutes, ordered that the Green Party and Constitution Party be listed alongside the names of their respective candidates on the 2012 general-election ballot, and instructed the state to "conduct a public random drawing" to determine the order in which the parties would be listed on the ballot. *Id.* at 1019. The defendants appealed and sought a partial stay of the district court's order. This court granted their request for a stay only as to the random drawing for ballot order. *See Green Party of Tenn. v. Hargett*, 493 F. App'x 686 (2012) (per curiam).

After the defendants had filed their notice of appeal, the plaintiffs moved for attorney's fees, which the defendants opposed in part. Of the approximately $90,000 in fees that the plaintiffs requested, the court granted $65,181 after concluding that some hours had been "block-billed" or not described with the necessary specificity.

### 2. *Tennessee's Statutory Amendments*

In the spring of 2012, while the defendants' appeal was pending, Tennessee amended its ballot-access statutes. The legislature eliminated the requirement that all parties' candidates for certain offices be selected by primary election and replaced it with a provision permitting minor parties to "nominate their candidates for any office *by any method authorized under the rules of the party or* by primary election." 2012 Tenn. Pub. Acts Ch. 955, § 6 (amending Tenn. Code Ann. § 2-13-203(a)) (emphasis added). Under the new regime, if a party chooses to nominate by its own procedures, rather than by primary election, the party must then qualify to appear on the general election ballot by filing a petition meeting the 2.5% signature requirement at least 90 days before the general election. 2012 Tenn. Pub. Acts. Ch. 955, § 1 (amending Tenn. Code Ann. § 2-13-107(a)). On the other hand, if a party chooses to hold a primary election, the 2.5% signature requirement and original petition-filing deadline—119 days before the primary election, in early April—remain unchanged. Tenn. Code. Ann. § 2-13-107(a)(1) (2012).

### 3. *The Initial Appeal*

In the fall of 2012, after that year's general election, a panel of this court reversed the district court's grant of summary judgment to the plaintiffs and remanded the case for further development. *Green Party*, 700 F.3d at 819. In doing so, the court noted that Tennessee's amendments to its ballot-access scheme had "fundamentally changed" the legal framework at

issue and concluded that the district court should have the opportunity to re-evaluate the plaintiffs' claims. *Id.* at 824.

Two aspects of the panel's decision are particularly relevant now. First, the panel observed that, although minor parties were no longer compelled to hold primary elections, they were still bound by the 2.5% signature requirement. Because this provision remained in place, the panel reasoned that the plaintiffs' ballot-access claim was not moot. It therefore remanded this claim, instructing the district court "to evaluate the various components of Tennessee's election laws as part of the larger framework for providing ballot access to minor political parties." *Id.* However, the panel drew an important legal conclusion, by which it intended to limit the district court's analysis: it concluded "that the 2.5% signature requirement, standing alone, is not unconstitutional on its face." *Id.* (citing *Am. Party of Tex. v. White*, 415 U.S. 767, 789 (1974), and *Jenness v. Fortson*, 403 U.S. 431 (1971)).

Second, the panel remanded the plaintiffs' claim regarding the ordering of parties on general-election ballots. Characterizing this challenge as facial in nature, the panel concluded that it "f[ell] short" of the difficult standard such claims entailed. *Id.* at 826. As the panel explained, the district court record did not establish how Tennessee's ballots were formatted, which the panel found relevant to the question of whether, and to what degree, the order of parties affects voter behavior. *Id.* at 827 (citations omitted). The panel therefore remanded for further factual development. *Id.*

### 4. After Remand

About two months after the case was remanded, the plaintiffs again moved for summary judgment, arguing that the existing record established that the Tennessee statutes were unconstitutional notwithstanding this court's view that the ballot-access scheme had fundamentally changed. Little additional discovery occurred on remand, though the plaintiffs did submit a copy of each Tennessee county's 2012 general-election ballot, as relevant to their claim regarding preferential ballot-ordering. The defendants filed a response as well as a cross-motion for summary judgment. They submitted to the court an additional affidavit and pointed to evidence already in the record to argue that the plaintiffs lacked standing in light of the recent statutory changes and that their claims lacked merit.

Again, the district court granted summary judgment to the plaintiffs. *Green Party II*, 953 F. Supp. 2d at 823. The court first concluded that the 2.5% signature requirement, in combination with the new 90-day filing deadline, was greater than necessary to show "a modicum of voter support for ballot access," and that "historical and expert proof" established that the requirement "imposes a severe burden on [p]laintiffs' First Amendment rights." *Id.* Second, the court held that Tennessee's ballot-ordering provision violated the Fourteenth Amendment because empirical studies "relied upon by [other] courts" demonstrate that a candidate's placement on the ballot affects voting behavior. *Id.* The defendants now appeal this second grant of summary judgment.

The defendants also appeal the district court's award of attorney's fees to the plaintiffs. As noted, the district court initially granted the plaintiffs $65,181 in fees. After a panel of this court reversed and remanded the case, the defendants unsuccessfully moved for relief from the fee award, arguing that the plaintiffs were no longer a prevailing party. The court then re-granted summary judgment, and the plaintiffs sought additional fees incurred after remand, which the defendants opposed. The district court granted in part the plaintiffs' new motion for fees, awarding them an additional $15,587. On appeal, the defendants argue that both the original and the additional fee awards were erroneous.

## II. ANALYSIS

### A. Standard of Review

This court reviews a grant of summary judgment de novo. *Green Party*, 700 F.3d at 822 (citing *Huckaby v. Priest*, 636 F.3d 211, 216 (6th Cir. 2011)). A court may grant summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the court determines that there are genuine disputes over material facts—"facts that might affect the outcome of the suit"—it must deny the motion for summary judgment. *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013). In making this determination, we construe the evidence "in the light most favorable to" the non-moving party. *Id.*

**B. Standing**

As an initial matter, the defendants assert that the plaintiffs lack standing to challenge Tennessee's ballot-access and ballot-ordering statutes. This argument relies largely on the fact that the state's intervening statutory amendments provided the plaintiffs with a new means of appearing on the ballot. Although the plaintiffs' complaint originally challenged three of Tennessee's ballot-access provisions on their own and in combination—the primary-election requirement, the 2.5% signature requirement, and the 119-day petition-filing deadline—this scheme for appearing on the ballot is now optional. *See* 2012 Tenn. Pub. Acts Ch. 955, § 6 (amending Tenn. Code Ann. § 2-13-203(a)). The defendants therefore argue that because the plaintiffs have not stated or demonstrated that they intend to select candidates by primary election, rather than by their own procedures, they no longer have standing to attack these provisions. We disagree.

*1. Legal Framework for Standing*

The doctrine of standing functions to ensure that courts apply the judicial power only to "cases" and "controversies" and not to abstract legal quandaries. *See* U.S. Const., art. III, § 2, cl. 1. Put differently, standing allows courts to determine whether a plaintiff has a "personal stake in the outcome of the controversy." *Susan B. Anthony List v. Dreihaus*, 134 S. Ct. 2334, 2341 (2014) (internal quotation marks omitted). When a plaintiff asserts only an "undifferentiated, generalized grievance about the conduct of government" and fails to show that he or she has suffered a particular harm, courts will deny the plaintiff standing. *Lance v. Coffman*, 549 U.S. 437, 442 (2007).

To demonstrate standing, a plaintiff must show an "injury in fact," meaning an injury to a legally cognizable interest that is "concrete and particularized" and "actual and imminent," rather than "conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks omitted). Additionally, the plaintiff must demonstrate "a causal connection between the injury" and the defendant's conduct, and must show that a favorable decision from the court would likely redress the harm. *Id.* at 560–61. The defendants argue that the Green Party and Constitution Party lack the first requirement, an injury in fact.

*2. Ballot-Access Provisions*

Although the defendants correctly note that the plaintiffs are no longer compelled to hold primary elections, one key aspect of their challenge still stands. Regardless of how the plaintiffs choose to select their candidates, they will not appear on Tennessee's general-election ballot unless they circulate a petition and meet the 2.5% signature requirement. This court, in the initial appeal, relied on this point when it noted that the intervening changes to Tennessee law did not render the plaintiffs' ballot-access claim moot. *Green Party*, 700 F.3d at 822–24. Moreover, the signature requirement applies indefinitely. To have any hope of participating in a general election, a minor political party must consistently concern itself with how to qualify for ballot access and, necessarily, how to obtain the required number of signatures. A minor political party can escape the petition-signature requirement only by attaining "statewide political party" status—which would, of course, first require the party to file a qualifying petition and participate in a general election. *See* Tenn. Code Ann. § 2-1-104(a)(31).

Granted, under the amended laws, the plaintiffs have more time to collect the necessary signatures—until 90 days before the general election, should they choose not to hold a primary. But this new fact merely alters the court's analysis; it does not deprive the plaintiffs of standing. Notwithstanding other changes to the law, the plaintiffs continue to assert that the 2.5% requirement is unworkable in light of Tennessee's "larger framework" for regulating ballot access. *Green Party*, 700 F.3d at 824.

The records in this case and in other cases involving these parties establish that the plaintiffs have actively participated in Tennessee politics, even though neither has qualified to appear on a ballot by petition. Both parties have endorsed their chosen candidates in Tennessee, who then appeared on the state's ballot without a political affiliation; additionally, the Constitution Party has tried but failed to collect the requisite number of signatures. *See Green Party I*, 882 F. Supp. 2d at 968–69; *Goins*, 793 F. Supp. 2d at 1072–73. In light of Tennessee's stringent and costly ballot-access requirements—particularly, those in effect before 2012—it is understandable that the plaintiffs have chosen to participate in state politics without seeking party recognition in all election cycles.

Furthermore, the plaintiffs have suffered a unique, individualized harm as a result of Tennessee's ballot access laws, an "injury peculiar to" them and not "common to all members of the public." *Lance*, 549 U.S. at 440 (internal quotation marks omitted). Tennessee's ballot-access laws have restricted the plaintiffs' political activities within the state and have limited their ability to associate as political organizations, and the plaintiffs have therefore articulated "a factual showing of perceptible harm" resulting from the state's regulations. *See Lujan*, 504 U.S. at 566; *see also Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1152–54 (2013) (distinguishing, in the First Amendment context, between "allegations of a subjective chill" on free expression, which do not confer standing, and allegations that government acts "regulate, constrain, or compel" the plaintiff's actions, which may confer standing (alteration and internal quotation marks omitted)); *see also LaRoque v. Holder*, 650 F.3d 777, 786–87 (D.C. Cir. 2011) (candidate had standing to challenge application of § 5 of the Voting Rights Act without any "obligation to demonstrate definitively" that he would have a better chance of succeeding without the application of § 5); *Krislov v. Rednour*, 226 F.3d 851, 855, 857–58 (7th Cir. 2000) (candidate had standing to challenge petition-circulation requirement despite having voluntarily dropped out of race for office). Because the 2.5% signature requirement directly affects the plaintiffs' ability to associate and campaign for political office, they maintain standing to challenge Tennessee's new ballot-access scheme.

### 3. Ballot-Ordering Provision

The defendants further argue that because plaintiffs have not qualified for ballot access in an upcoming election, they have not suffered an injury in fact arising from the state's ballot-ordering provision. This argument likewise fails. As discussed above, the plaintiffs have participated in Tennessee's electoral politics in various ways, including by backing candidates listed as independents on the state's ballots. These independent candidates, it bears noting, were affected by the ballot-ordering statute. Furthermore, as the district court noted in its second order granting summary judgment, the plaintiffs *did* in fact appear on the general election ballot in 2012 as a result of the court's first order and were therefore subject to the ballot-ordering rule

at that time. *Green Party II*, 953 F. Supp. 2d at 843. We conclude that the plaintiffs have standing to pursue their ballot-access claim as well as their ballot-ordering claim.[1]

**C. Tennessee's 2.5% Petition-Signature Requirement and its Overall Ballot-Access Scheme**

At the core of the plaintiffs' ballot-access claim is Tennessee's 2.5% petition-signature requirement, which remains unchanged despite the state's recent statutory amendments. The record, and the plaintiffs' arguments before this court, clearly identify the signature requirement as the key barrier impeding the plaintiffs from participating in general elections. But we can evaluate the impact of this requirement only within the context of Tennessee's ballot-access scheme as a whole, including its new deadline for submitting petitions. *See Green Party*, 700 F.3d at 824 (citing *Libertarian Party of Ohio v. Blackwell* (*Blackwell*), 462 F.3d 579, 586 (6th Cir. 2006)). Moreover, because the signature requirement "standing alone, is not unconstitutional on its face," *id.* at 824, we must consider its actual effects on the plaintiffs specifically. Because we conclude that the record does not allow us to determine the extent to which the plaintiffs are burdened by the signature requirement, as it operates in combination with Tennessee's new deadline and other aspects of its ballot-access scheme, we reverse the district court's grant of summary judgment and remand for further development of the record.

*1. Legal Framework for Ballot-Access Claims*

The right of individuals to associate in political organizations, and the right of citizens to cast a meaningful vote, are among the most important values in our democracy. *See Blackwell*, 462 F.3d at 585 (citing *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)). Associational rights and voting rights are closely connected, since "the right to form a party for the advancement of

---

[1]Although the defendants challenge only the plaintiffs' standing, other concepts of justiciability help to illustrate why the plaintiffs have suffered a cognizable injury. *See* 13B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 3531.12 (3d ed. 1998) (observing that "[r]ipeness and mootness easily could be seen as the time dimensions of standing"). As the plaintiffs aptly argue, their alleged injury is not moot because it is "capable of repetition, yet evading review." *See Libertarian Party of Mich. v. Johnson*, 714 F.3d 929, 930 (6th Cir. 2013); *Libertarian Party of Ohio v. Blackwell* (*Blackwell*), 462 F.3d 579, 585 (6th Cir. 2006). Similarly, the plaintiffs' claim is not unripe, as it "arises in a concrete factual context and concerns a dispute that is likely to come to pass." *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc) (internal quotation marks omitted). Moreover, the plaintiffs would likely suffer hardship if they must wait to adjudicate this claim. *Id.* If this court were to hold that the plaintiffs can challenge the ballot-ordering statute only after qualifying for ballot access, a court hearing the new case would likely have at most 90 days to consider it.

political goals means little if a party can be kept off the election ballot." *Williams*, 393 U.S. at 31. Still, states may impose reasonable restrictions on ballot access to ensure that political candidates can show a "significant modicum of support" from the public, *Jenness v. Fortson*, 403 U.S. 431, 442 (1971), and to avoid "election- and campaign-related disorder," *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997). State restrictions on ballot access therefore "are not automatically subjected to heightened scrutiny." *Blackwell*, 462 F.3d at 585.

The Supreme Court articulated the contemporary standard for evaluating constitutional challenges to a state's election laws in *Anderson v. Celebrezze*, 460 U.S. 780, 788–89 (1983), and again in *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). First, the court must "consider the character and magnitude of" the plaintiff's alleged injury. *Anderson*, 460 U.S. at 789. Next, it "must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." *Id.* Finally, it must assess the "legitimacy and strength of each of those interests," as well as the "extent to which those interests make it necessary to burden the plaintiff's rights." *Id.*

The first step in this analysis is important. When the restrictions imposed by the state are "severe," they will fail unless they are narrowly tailored and advance a compelling state interest. *Burdick*, 504 U.S. at 434. If, however, the regulations are minimally burdensome and nondiscriminatory, rational-basis review applies, and the regulations will usually pass constitutional muster if the state can identify "important regulatory interests" that they further. *Id.* Of course, many regulations "fall in between these two extremes." *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012). In these situations, courts engage in a flexible analysis, weighing the burden on the plaintiffs against the state's asserted interest and chosen means of pursuing it. *See Anderson*, 460 U.S. at 789; *Obama for Am.*, 697 F.3d at 429.

In cases predating *Anderson* and *Burdick*, the Supreme Court held that petition-signature requirements as high as 5% are not facially invalid. Three cases are particularly relevant here. First, in *Jenness v. Fortson*, the Court upheld Georgia's ballot-access scheme requiring independent and minor-party candidates to submit petitions meeting a 5% signature requirement in early June. 403 U.S. at 433, 442. Three years later, the Court considered another 5% signature requirement in *Storer v. Brown*, 415 U.S. 724, 726–27 (1974). Noting that the

California laws at issue in *Storer* placed a substantial limitation on the collection of signatures—in particular, a signer was not eligible if he or she had participated in another party's primary election—the Court vacated the judgment for the state and remanded the case to determine whether this added hurdle made the 5% requirement unduly burdensome. *Id.* at 738–40. And that same year, in *American Party of Texas v. White*, the Court held constitutional a 1% party-support requirement that also imposed additional restrictions on petition circulation, including a notarization requirement and a signature-disqualification provision similar to that in *Storer*. 415 U.S. 767, 777–80 (1974). These cases remain good law.[2] Both the prior panel of this court and the district court took note of this fact and concluded that, under these precedents, Tennessee's 2.5% requirement is not facially unconstitutional. *Green Party*, 700 F.3d at 820–21, 824 (quoting the district court opinion).

## 2. Application

Under the contemporary *Anderson-Burdick* framework, our first and central question is whether the district court properly re-granted summary judgment to the plaintiffs on the basis that Tennessee's 2.5% signature requirement, as applied, imposed a severe burden on the exercise of their First Amendment rights. To answer this question, we evaluate the effects of the signature requirement on the plaintiff political parties, keeping in mind that other aspects of Tennessee's ballot-access scheme might operate so as to make the signature requirement either harder or easier to meet. *See Blackwell*, 462 F.3d at 586. Here, these other aspects include the new two-option system—allowing minor parties to nominate either by primary election or by some other process of their choosing—the respective 119-day and 90-day petition deadlines, the

---

[2]Although the plaintiffs suggest that *American Party* and *Jenness* have been abrogated by *Anderson* and *Burdick*, the Supreme Court has continued to treat these cases as valid precedent. *See, e.g., New York State Bd. of Elections v. López Torres*, 552 U.S. 196, 204 (2008) (citing both cases). We understand *Anderson* and *Burdick* to clarify the proper analysis a court should use in evaluating an election-law claim, without calling into question the Supreme Court's determination that petition-signature requirements of up to 5% are not necessarily facially invalid. Furthermore, the Court's older precedent is consistent with *Anderson* and *Burdick* in acknowledging that the severity of a burden significantly influences a court's analysis. *See, e.g., Am. Party of Tex.*, 415 U.S. at 783 (ballot-access provision "may not be so excessive or impractical as to . . . always, or almost always, exclude parties with significant support from the ballot"); *Williams*, 393 U.S. at 31 (noting that the state has "failed to show any 'compelling interest' which justifies imposing such heavy burdens on the right to vote and to associate").

timing of these two deadlines relative to major-party campaign activity, and any other restrictions limiting the circulation of petitions and campaigning.[3]

Whether a voting regulation imposes a severe burden is a question with both legal and factual dimensions. *See Blackwell*, 462 F.3d at 587 (listing factors to consider). If a restriction does not "affect a political party's ability to perform its primary functions," such as organizing, recruiting members, and choosing and promoting a candidate, the burden typically is not considered severe. *Id.* Tennessee's ballot-access rules strike at the very heart of the plaintiffs' primary functions and no doubt constrain their opportunities to effect political change. But this fact alone does not permit us to conclude that the burden is severe; we must also consider "the effect of the regulations on the voters, the parties and the candidates" and "evidence of the real impact the restriction has on the [political] process." *Id.* The record—which was not substantially developed upon remand—does not provide the information we would need to affirm the grant of summary judgment to the plaintiffs.

In both of its orders granting summary judgment, the district court relied heavily on the fact that minor parties have consistently been absent from Tennessee's ballots. *Green Party II*, 953 F. Supp. 2d at 827–28, 852; *Green Party I*, 882 F. Supp. 2d at 1007. As the district court discussed, Tennessee instituted a 5% petition-signature requirement in 1961, which it later lowered to 2.5% in 1972. Although before 1961, "minor political parties appeared regularly on the Tennessee ballot," since 1961, only George Wallace's American Independent Party has qualified, on two occasions. *Green Party II*, 953 F. Supp. 2d at 827. We agree with the district court that "[p]ast experience will be a helpful, if not always an unerring, guide" in evaluating the effects of a signature requirement. *Storer*, 415 U.S. at 742. However, the historical record here is less relevant than it was before the recent changes to the law because the record does not help us evaluate whether the effective extension of Tennessee's petition-filing deadline by four months has eased the plaintiffs' burden. Tennessee's old deadline fell in mid-April, 119 days

---

[3]We do not consider whether Tennessee's old (but now-optional) scheme for accessing the ballot via primary election remains unconstitutional despite the availability of a less-burdensome alternative. In their briefs regarding attorney's fees (Case No. 13-6280), the plaintiffs state that "neither [of the parties] have any desire to nominate their candidates by primaries and do not expect to ever want to nominate their candidates by primaries so long as they are classified as 'minor parties.'" (Pls.' Br. at 19.) Additionally, the plaintiffs' briefs for their main case (No. 13-5795) do not raise arguments that pertain specifically or uniquely to the 119-day deadline, but focus mainly on attacking the 2.5% signature requirement.

before the statewide primary election and 208 days before the general election. In contrast, the *new* deadline for a party choosing not to nominate by primary election falls substantially later, in early August, one day before the primary election and 90 days before the general election.

Both the Supreme Court and this court have explained the burdens posed by petition-filing deadlines set too early in the election year. Independent and minor-party candidates often craft their platforms in response to mainstream candidates' views, and they typically appeal to voters "dissatisfied with the choices within the two major parties." *Anderson*, 460 U.S. at 791; *see also Blackwell*, 462 F.3d at 590–91. If these candidates are required to complete their petitioning process many months before the general election, when the major parties' nominations are only beginning, they are less able to position themselves as meaningful alternatives. Moreover, they must petition for support among a public that is less engaged and informed than it would be later in the election cycle. *Anderson*, 460 U.S. at 792.

Under Tennessee's new laws, a minor party must still obtain signatures before the primary election, but it is no longer required to complete its petitioning process months before the general election. By setting a later deadline, Tennessee has alleviated the burden of its ballot-access requirements to at least some extent, but we cannot say how much. The district court concluded that "a comparison of Tennessee's 2012 amendments and the 2011 statute reveals little substantive change," explaining that the new filing deadline for minor parties opting not to participate in the state's primary election still "operates to require collection of signatures during the same time period preceding the August primary that caused the 120 day deadline to be held unconstitutional in *Blackwell* and [that] led [the district court] to hold Tennessee's prior 119 day deadline unconstitutional." *Green Party II*, 953 F. Supp. 2d at 847–48 (citation omitted). This reasoning, however, is based on an overly broad reading of *Blackwell* as establishing that a petition deadline set before or at the same time as a state's primary election is *necessarily* unconstitutional. In fact, *Blackwell* struck down an Ohio ballot-access scheme similar to Tennessee's old regime, with a lower signature requirement of 1% but a filing deadline set 120 days before the primary, and (because Ohio's primaries are held early) nearly a full year—364 days—before the general election. 462 F.3d at 582–83, 591. *Blackwell* does not definitively establish that Tennessee's current filing deadline imposes a severe burden on the

plaintiffs, either standing alone or in combination with the 2.5% signature requirement. The change to Tennessee's filing deadline presents factual questions that cannot be answered on the existing record.

We therefore reverse the district court's grant of summary judgment and remand this claim for further factual development. We note that the current record does not support granting summary judgment in favor of the plaintiffs, the party bearing the burden of proof, because it does not show that there is no genuine dispute of material fact or that the plaintiffs are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). As discussed above, the relevant legal precedents do not prove that Tennessee's signature requirement is itself unconstitutional, and the record lacks the factual information we need to determine whether it actually imposes a severe burden on the plaintiffs. We advise the district court to re-open the record on remand so that the parties may submit evidence relevant to the effect of Tennessee's current ballot-access scheme.[4]

As a final point, we agree with the district court that the defendants have not, at least at this point, put forth compelling interests to support a signature requirement of 2.5%, rather than something lower. The court rightly pointed out that Tennessee's supposed interest in avoiding "voter confusion" is undermined by its rules that liberally grant ballot access to independent candidates. *See* Tenn. Code Ann. § 2-5-101(b). For example, in 2012, Tennessee's ballot included nine candidates for the United States Senate, five of whom were independents (and this number would have been seven, if not for the district court's order that the Green and Constitution Party names appear alongside their candidates). It is a puzzling proposition that voters should be less confused by a ballot listing numerous candidates *without* a party designation than by a similar ballot *including* party designations; the latter, at least, contains information helpful to distinguishing among lesser-known candidates. However, under the

---

[4]Although the plaintiffs cannot, at this point, present evidence of their *own* difficulties complying with Tennessee's new scheme, given that it has only recently been enacted, they should nevertheless be able to develop evidence relevant to this scheme. For example, they might survey states with ballot-access requirements similar to Tennessee's current ones to determine whether minor parties have had success in appearing on the ballot in those states. They might obtain affidavits from party organizers in other states describing the difficulties that they encounter complying with requirements similar to Tennessee's. Their experts might be able identify meaningful distinctions between Tennessee and other states—based on such factors as geography, population demographics, the educational attainments of its residents, etc.—that could conceivably influence the petitioning process. Additionally, more detailed evidence of the plaintiffs' own past attempts to meet Tennessee's petition-signature requirements could also be helpful. These suggestions are not intended to limit the type of evidence that the parties might develop on remand, but only to illustrate where they might begin.

standard for evaluating ballot-access restrictions, "the rigorousness of our inquiry . . . depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Burdick*, 504 U.S. at 434. Because we cannot determine, on the existing record, whether Tennessee's current scheme imposes a severe burden on the plaintiffs, we cannot invalidate this scheme simply because the state's interests are not compelling. We remand so that the district court may reassess both the extent of the plaintiffs' burden, and the state's asserted interests, on a more thoroughly developed record.

## D.  Tennessee's Preferential Ballot-Ordering Statute

The defendants also challenge the district court's conclusion that Tennessee's ballot-ordering statute violates the First and Fourteenth Amendments by granting favorable treatment to established political parties. *Green Party II*, 953 F. Supp. 2d at 860. The district court twice granted summary judgment in the plaintiffs' favor on this claim. After its first grant of summary judgment, this court reversed and remanded on the following grounds.

First, the panel noted that the plaintiffs' challenge was facial in nature and that the plaintiffs had not put forward evidence demonstrating that ballot position had led to voter bias in Tennessee. *Green Party*, 700 F.3d at 826–27 ("[W]e have no evidentiary record against which to assess [the plaintiffs'] assertions that voters will be confused or influenced by the position of the names on the ballot." (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 455 (2008)) (internal quotation marks omitted). Second, the panel explained that Tennessee "presumptively uses what is known as a 'party block' ballot form [on which] all of the candidates for a party are listed in a single column." *Id.* at 827 (internal quotation marks omitted)).[5] This format, the panel reasoned, might mitigate any bias caused by preferential party

---

[5]Indeed, the applicable statute does seem to describe a ballot that groups candidates in vertical rows under party headings, not office headings. Tenn. Code Ann. § 2-5-206(b)(2) reads:

> In general elections, the title of the offices shall be placed vertically on the left or the right side of the ballot, and there shall be a vertical column for each political party. Any candidate whose name is to be placed on the ballot by virtue of party nomination shall be listed in the political column of such candidate's party, opposite the title of the office the candidate seeks. One (1) vertical column for independent candidates shall be placed on the ballot and shall appear immediately after the political party columns. The independent candidates shall be listed in alphabetical order according to the initials of their surnames, beginning with the first initial.

However, the ballots submitted by the plaintiffs do not conform to this description.

order, as hypothesized by one of the studies the district court cited. Although the plaintiffs had submitted to the panel (and not to the district court) one ballot from one Tennessee county using a "office block" format, the panel declined to consider this evidence "in the first instance," and remanded for the district court "to further develop the factual record as necessary." *Id.* The panel did not conclude that the use of office block ballots *alone* would be enough to render the ballot-ordering statute unconstitutional.

After remand, the plaintiffs submitted portions of ballots for the 2012 general election from each of Tennessee's 95 counties. All used the office block format, despite the prior panel's observation that Tennessee law seemed to require a party block format. After evaluating the record as a whole, including this new evidence, we again conclude that the district court erroneously granted the plaintiffs summary judgment on this claim.

### 1. Legal Framework for Ballot-Ordering Provisions

The plaintiffs' ballot-ordering claim presents a question of first impression in our circuit. Cases from other jurisdictions are all over the map. *Compare McLain v. Meier*, 637 F.2d 1159, 1166–67 (8th Cir. 1980) (incumbent-first statute unconstitutional under even rational-basis analysis, where clearly erroneous standard of review applied to district court's factual determination that placement affected voter behavior), *and Gould v. Grubb*, 536 P.2d 1337, 1338–39 (Cal. 1975) (similar), *with Bd. of Election Comm'rs of Chi. v. Libertarian Party of Ill.*, 591 F.2d 22, 25–27 (7th Cir. 1979) (two-tier system, with candidates of two major parties appearing first and second on ballot and all other candidates following, did not violate constitution absent showing of "intentional or purposeful discrimination"), *and New Alliance Party v. N.Y. State Bd. of Elections*, 861 F. Supp. 282, 284–85, 288 (S.D.N.Y. 1994) (plaintiff had not submitted sufficient evidence that preferential ballot ordering influences voter choice, and judicial notice was not warranted).

Beyond disagreeing as to outcomes, courts have not settled on a particular standard for evaluating preferential ballot-order statutes. Some courts have applied an analysis consistent with the *Anderson-Burdick* framework. *See McLain*, 637 F.2d at 1167 (noting that the legal standard "is anything but clear" but observing that because preferential ballot-ordering rules do not exclude a candidate from the ballot entirely, "most courts have applied the rational basis

test"). Others have required plaintiffs to show "an intentional or purposeful discrimination" against minor-party and independent candidates. *Bd. of Election Comm'rs of Chi.*, 591 F.2d at 24–25. Here, the plaintiffs' claim draws not only on the Equal Protection Clause, but also on the First Amendment: essentially, the plaintiffs argue that they have been denied an equal opportunity to exercise their rights to association and political expression. We therefore conclude that this claim is most appropriately evaluated under the framework of *Anderson*, 460 U.S. at 788–89, and *Burdick*, 504 U.S. at 434. *See Obama for Am.*, 697 F.3d at 430 (explaining that *Anderson* and *Burdick* articulate "a single standard for evaluating challenges to voting restrictions," whether raised under the First or the Fourteenth Amendments).

*2. Application*

As the district court recognized, studies do not definitively establish whether a party's or candidate's position on the ballot influences voter behavior. *Green Party II*, 953 F. Supp. 2d at 859–60. Some conclude that it likely does, some conclude that it may, but only to a small degree or only in nonpartisan elections, and some conclude that it likely does not. Moreover, as the defendants argued, some studies have concluded that the most important factor affecting voter decision in a partisan election—like Tennessee's general election—is party affiliation. Ultimately, the district court chose to credit studies, as well as cases from other jurisdictions, finding that preferential ballot-placement statutes confer a benefit on candidates listed first or at the top of the ballot. In particular, the court explained that it was "rel[ying] upon the Eighth Circuit's ruling in *McLain* that despite differences in the studies, 'many studies report a finding of some ballot advantage in the top position.'" *Id.* at 860 (quoting 637 F.2d at 1166 n.15).

Given that this case is at the summary judgment stage, the district court erred in reaching its conclusion on the basis of conflicting evidence and cases from other jurisdictions. Even on an issue involving abstract legal principles, and not just everyday factual questions of the sort that juries readily decide, a plaintiff moving for summary judgment bears the same heavy burden a defendant does. The plaintiff must demonstrate that there is no genuine issue of material fact, while the court must draw all reasonable inferences in favor of the non-moving party. *See Villegas*, 709 F.3d at 568. The effect of preferential ballot ordering on voter behavior involves questions of fact, *see McLain*, 637 F.2d at 1166, and the record here simply does not establish

that Tennessee's ballot-ordering statute appreciably affects voter behavior. Rather, it establishes only that there is a factual dispute as to whether ballot position sways voters, and if so, how much. This is precisely the sort of question that cannot be resolved on summary judgment. We therefore reverse the district court's grant of summary judgment on this claim and remand it for further development.

**E. The District Court's Award of Attorney's Fees**

Finally, the defendants appeal the district court's award of attorney's fees in the amount of $76,768.41—an initial $61,180.91 for fees incurred in the district court before the defendants' first appeal, and an additional $15,587.50 for fees incurred after remand. The defendants make two arguments: first, that the district court erred in denying their motion for relief from its initial fee award, filed shortly after this court remanded the case, and second, that the district court erred in granting plaintiffs additional fees on remand. Essentially, the defendants argue that the plaintiffs are not a "prevailing party" under the fee-awarding statute, 42 U.S.C. § 1988(b), because the prior panel reversed the district court's order granting them summary judgment. We reject the defendants' contention that the plaintiffs are not a prevailing party, but we vacate the district court's fee award and remand for recalculation.

*1. Legal Framework for Awarding Attorney's Fees*

Although litigants are typically responsible for paying their own attorney's fees, Congress has created exceptions for certain types of cases. Under 42 U.S.C. § 1988(b), the "prevailing party" in an action to enforce civil rights under § 1983 may recover "a reasonable attorney's fee as part of the costs" of litigation. *See Hescott v. City of Saginaw*, --- F.3d ---, 2014 WL 2959289, at *3 (6th Cir. 2014). To be considered a prevailing party, a litigant must have "receive[d] at least some relief on the merits of his claim" amounting to "a court-ordered change in the legal relationship between the plaintiff and the defendant." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603–04 (2001) (internal quotation marks and alterations in original omitted). Thus, if a defendant voluntarily changes its conduct during the course of litigation, thereby mooting the plaintiff's case, the plaintiff will not be considered a prevailing party even though he or she may have obtained the relief sought. *Id.* at 605.

These basic principles still apply when a court of appeals reverses a district court's judgment that rendered one of the litigants a prevailing party. If the court of appeals reverses on the *merits* of the underlying claims, the formerly prevailing party no longer prevails and is no longer entitled to fees. *See, e.g.*, *Am. Atheists, Inc. v. City of Detroit Downtown Dev. Auth.*, 567 F.3d 278, 301 (6th Cir. 2009). In contrast, if the reversal is not on the merits, it does not necessarily upset the prevailing party's status. "When plaintiffs clearly succeeded in obtaining the relief sought before the district court and an intervening event rendered the case moot on appeal, plaintiffs are still prevailing parties for the purposes of attorney's fees for the district court litigation." *Diffenderfer v. Gomez-Colon*, 587 F.3d 445, 454 (1st Cir. 2009) (affirming fee award to plaintiffs who obtained permanent injunction of Puerto Rico election law in district court, but whose judgment was mooted by territory's voluntary change to the law); *see also UFO Chuting of Haw., Inc. v. Smith*, 508 F.3d 1189, 1197 (9th Cir. 2007); *Roadway Express, Inc. v. Admin. Review Bd., U.S. Dep't of Labor*, 6 F. App'x 297, 301 (6th Cir. 2001) (collecting cases).

Furthermore, a civil-rights plaintiff need not succeed on every claim in order to recover attorney's fees. Success on a single claim is sufficient to become a prevailing party. *See McQueary v. Conway*, 614 F.3d 591, 603 (6th Cir. 2010). When, however, a plaintiff's unmeritorious claims are "based on different facts and different legal theories" than her meritorious claims, a court must treat them "as if they had been raised in separate lawsuits, and therefore no fee may be awarded for services on the unsuccessful claim[s]." *Tex. State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 789 (1989) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983)). In contrast, if a plaintiff has made both meritorious and unmeritorious claims that "arise out of a common core of facts, and involve related legal theories," a court should not exempt from its fee award the hours spent on the claims that did not succeed. *Id.* at 789. Instead, the court should consider, as its ultimate guide, "the degree of success obtained." *Id.* (quoting *Hensley*, 461 U.S. at 436). To determine whether two claims are related, a court may find it helpful to consider "whether relief sought on the unsuccessful claim is intended to remedy a course of conduct entirely distinct and separate from" that which gave rise to the plaintiff's successful claim. *Jordan v. City of Cleveland*, 464 F.3d 584, 603 (6th Cir. 2006) (internal quotation marks omitted).

An attorney who achieves "excellent results" is entitled to a full fee, regardless of whether he or she succeeds on every related claim raised. *Waldo v. Consumers Energy, Co.*, 726 F.3d 802, 822 (6th Cir. 2013). However, when the plaintiff's success is limited, the court may "exercise [its] equitable discretion . . . to arrive at a reasonable fee award" in light of the hours expended. *Tex. State Teachers Ass'n*, 489 U.S. at 789. In no case should a court reduce a full fee award "simply by using a ratio of successful claims to claims raised." *Waldo*, 726 F.3d at 822.

This court reviews an award of attorney's fees under the abuse of discretion standard. Abuse of discretion occurs when the district court "relies upon clearly erroneous factual findings, applies the law improperly, or uses an erroneous legal standard." *DiLaura v. Twp. of Ann Arbor*, 471 F.3d 666, 671 (6th Cir. 2006) (internal quotation marks omitted).

*2. Application*

We conclude that the plaintiffs qualify as prevailing parties because the district court initially ruled that Tennessee's then-current ballot-access scheme—with mandatory primary elections, a 2.5% petition-signature requirement, and a 119-day filing deadline—was unconstitutional, and the court ordered declaratory and injunctive relief to remedy the violation. *Green Party I*, 882 F. Supp. 2d at 1019–20. The plaintiffs have *not* been stripped of their prevailing party status by the legislature's decision to amend the relevant statutes two months after the district court issued its order but before the defendants' appeal was heard. *See Diffenderfer*, 587 F.3d at 454; *Roadway Express*, 6 F. App'x at 301; *see also DiLaura*, 471 F.3d at 671. Moreover, this court never reached the merits of Tennessee's old ballot-access scheme and has done nothing to disturb the original judgment of the district court.

However, the plaintiffs are not necessarily entitled to all of the fees the district court originally awarded them. The plaintiffs' complaint initially raised four claims against the defendants: (1) that Tennessee's ballot-access scheme violated their First Amendment rights, (2) that one particular ballot-access statute was unconstitutionally vague and impermissibly delegated legislative authority to the state's coordinator of elections, (3) that a different statute barring minor parties from using the names "independent" or "nonpartisan" on the ballot violated the plaintiffs' First Amendment rights, and (4) that Tennessee's ballot-ordering statute was

unconstitutional.  The district court granted summary judgment in the plaintiffs' favor on all four claims, but this court reversed summary judgment on claims (2) and (3) and did so on the merits. *Green Party*, 700 F.3d at 825–26, 829.

Although the plaintiffs are prevailing parties, the district court abused its discretion by failing to reassess its fee award after this court reversed and remanded the case, and after the defendants filed a motion for reconsideration.  We accordingly vacate the district court's fee award and remand for recalculation of the proper amount.  In doing so, we call the district court's attention to claim (3), regarding minor party names, which this course reversed on the merits and which does not pertain to ballot access.  We leave it to the district court to determine how this court's reversal of summary judgment on this claim should affect its fee award, in accordance with the precedent discussed above.  We further note that the plaintiffs have not yet attained prevailing-party status on claim (1), regarding ballot-access, and claim (4), regarding ballot-ordering, in the second round of litigation following remand, and we therefore vacate its award of $15,587.50 in post-remand fees.

### III.  CONCLUSION

This case involves matters of great public importance.   Ballot-access laws invariably limit—to varying degrees—the right of political parties, candidates, and voters "to associate in the electoral arena" and thereby "enhance their political effectiveness as a group." *Anderson*, 460 U.S. at 794.  These regulations further threaten to diminish "diversity and competition in the marketplace of ideas" by ossifying the two-party status quo.  *Id.*  Nevertheless, we must reverse the district court's order granting summary judgment to the plaintiffs.  Their legal arguments hinge on questions of fact that the record, in its current state, does not resolve.

This case is accordingly remanded to the district court for further development.  On remand, the parties should supplement the existing record with further evidence demonstrating the effects of Tennessee's ballot-access and ballot-ordering provisions on the plaintiff minor parties, and with any other evidence that they and the district court deem relevant.  Furthermore, this evidence should account for the recent changes to Tennessee's ballot-access scheme.  We caution the district court and the parties that this court will not look favorably upon any effort to

dispose of this case at the summary judgment stage without substantial development of the record.

We also vacate the district court's award of attorney's fees to the plaintiffs and remand this issue to the district court for reassessment and recalculation consistent with this opinion.